IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; GEORGIA ASSOCIATION OF LATINO ELECTED OFFICIALS, INC., as an organization; VICTORIA ARZU, CLAUDETTE FORBES, JUDY JONES, DONNA MCLEOD, CATALINA ORTIZ, LOUISE ("PENNY") POOLE, KATHERINE VEGA, <br><br> Plaintiffs, <br><br> v. <br><br> GWINNETT COUNTY BOARD OF COMMISSIONERS; CHARLOTTE NASH, JACE BROOKS, LYNETTE HOWARD, TOMMY HUNTER, and JOHN HEARD, in their official capacities as Gwinnett County Commissioners; GWINNETT COUNTY PUBLIC SCHOOLS; CAROLE BOYCE, DANIEL SECKINGER, MARY KAY MURPHY, ROBERT MCCLURE, and LOUISE RADLOFF, in their official capacities as members of the Gwinnett County Board of Education; GWINNETT COUNTY BOARD OF REGISTRATIONS AND ELECTIONS, <br><br> Defendants. | Civil Action File No. _____ <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** <br><br> **(Section 2 of the Voting Rights Act - 52 U.S.C. § 10301)** |

## INTRODUCTION

1.     This action seeks declaratory and injunctive relief to address voting discrimination faced by Black, Latino, and Asian-American voters in Gwinnett County, Georgia.  Despite together constituting 53.5 percent (%) of the county's population, Black, Latino, and Asian-American voters have been denied an equal opportunity to elect candidates of choice to the Gwinnett County Board of Commissioners and the Gwinnett County Board of Education in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2").

2.     No Black, Latino, or Asian-American candidate has ever been elected to the Gwinnett County Board of Commissioners, Gwinnett County Board of Education, or any other Gwinnett County office, upon information and belief.

3.     Black, Latino, and Asian-American candidates for the Gwinnett County Board of Commissioners and the Gwinnett County Board of Education have consistently been defeated even though Black, Latino, and Asian residents together: (1) comprise approximately 53.5% of the total population in Gwinnett County according to the 2010 Census; (2) comprise about 42.6% of the citizen voting age population countywide; (3) comprise a majority of the voter-eligible population and registered voters in several geographically compact areas within Gwinnett County; and (4) vote in a politically cohesive manner for minority

2

candidates who run for the Board of Commissioners, Board of Education, and other offices.

4.     The Gwinnett County Board of Commissioners and Gwinnett County Board of Education both have five members.

5.     The use of an at-large seat for the Board of Commissioners and the current district boundaries used to elect the Board of Commissioners and the Board of Education needlessly submerge and divide the combined electoral strength of Gwinnett County's Black, Latino, and Asian-American residents.

6.     The Chairperson of the Gwinnett County Board of Commissioners is elected at-large, and the other four Commissioners are elected from single-member districts.  There is no Board of Commissioners district in which Blacks, Latinos, and Asian-Americans together constitute a majority of the citizen voting age population.  The Board of Commissioners' districting plan divides Gwinnett County's population so that Blacks, Latinos, and Asian-Americans together comprise between 39.4% and 45.3% of the voting age citizens in each of the four districts.

7.     All five members of the Gwinnett County Board of Education are elected from single-member districts.  The Board of Education's districting plan concentrates Blacks, Latinos, and Asian-Americans in District 5, with the

3

remainder spread evenly between Districts 1 through 4.  District 5 is the only current Board of Education district in which Blacks, Latinos, and Asians together comprise a majority of the citizen voting age population.

8.      The use of an at-large seat for the Board of Commissioners, and the current district boundaries employed by the Board of Commissioners and Board of Education, in the context of a pattern of white bloc voting, deny Black, Latino, and Asian-American voters an equal opportunity to vote together to elect candidates of their choice to the Board of Commissioners and the Board of Education.  White bloc voting usually leads to the defeat of the preferred candidates among Black, Latino, and Asian voters.

9.      Under a fairly-drawn single-member districting plan, Blacks, Latinos, and Asian-Americans together, Blacks and Latinos together, or Blacks and Asians together can comprise a majority of the citizen voting age population and have the opportunity to elect their candidates choice in two of five districts, which are reasonably compact and regular in shape, for both the Board of Commissioners and the Board of Education.  One such district can be created among four single-member districts for the Board of Commissioners.

10.     Under the totality of the circumstances, including the historical, socioeconomic, and other electoral conditions that prevail in Gwinnett

4

County, the at-large seat and current districting plan used to elect the Gwinnett County Board of Commissioners, and the districting plan used to elect the Gwinnett County Board of Education, each violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. *Thornburg v. Gingles*, 478 U.S. 30 (1986).

11.    For these reasons, and as further alleged in detail below, Plaintiffs respectfully pray for this Court to issue: (1) a declaratory judgment that the use of an at-large seat and the current district boundaries for the Gwinnett County Board of Commissioners violate Section 2 of the Voting Rights Act; (2) a declaratory judgment that the current district boundaries for the Gwinnett County Board of Education violate Section 2 of the Voting Rights Act; (3) an injunction against the further use of an at-large seat and the current district boundaries for the Board of Commissioners; (4) an injunction against the further use of the current district boundaries for the Board of Education; (5) orders requiring future elections for the Board of Commissioners and the Board of Education to be conducted under single-member district plans that comply with the Constitution and the Voting Rights Act; (6) an award of costs and reasonable attorneys' fees to Plaintiffs, including expert witness fees; and (7) such additional relief as is appropriate.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction of this action pursuant to (1) 28 U.S.C. § 1343(a), because this action seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act; and (2) 28 U.S.C. § 1331, because this action arises under the laws of the United States.

13.     This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

14.     This Court has personal jurisdiction over the Defendants, all of whom are citizens of the State of Georgia who reside within this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

### The Plaintiffs

16.     Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP ("Georgia NAACP") is a non-partisan, interracial, nonprofit membership organization that was founded in 1941.  Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African-Americans.  It is headquartered in Atlanta and currently has approximately 10,000

6

members.  The Georgia NAACP's membership includes Black voters who reside in an area of Gwinnett County that could constitute single-member County Commissioner and School Board districts containing a majority Black, Latino, and/or Asian-American citizen voting age population.  These members' voting strength is diluted by the ongoing violation of Section 2 in Gwinnett County.

17.   Plaintiff GEORGIA ASSOCIATION OF LATINO ELECTED OFFICIALS, INC. ("GALEO") is a non-partisan and nonprofit organization founded in Georgia under Section 501(c)(6) of the Internal Revenue Code.  It was established to increase representation of Latino elected and appointed officials, to proactively address issues and needs facing the Latino community, and to engage Georgia's Latino community in the democratic and political process.  It does so through (1) television, radio and print media Spanish public service announcements; (2) widespread distribution of literature regarding voter registration and other voting-related issues (in both English and Spanish); (3) administration of a voter information hotline and website (in both English and Spanish); (4) provision of electronic access to legislative voting records; and (5) voter mobilization efforts that include "get out to vote" phone calls and transporting voters to the polls.  *See* GALEO's Mission Statement, *available at* http://www.galeo.org/about_galeo.php.  GALEO's membership includes Latino voters who reside in an area of Gwinnett County that could constitute single-

7

member County Commissioner and School Board districts containing a majority Black, Latino, and/or Asian-American citizen voting age population. These members' voting strength is diluted by the ongoing violation of Section 2 in Gwinnett County.

18.    Plaintiff VICTORIA ARZU is an Afro-Latina resident and registered voter of Gwinnett County, Georgia. As a result of the county's Board of Education districts, and the method of election and districting scheme employed by the Board of Commissioners, Ms. Arzu has been unable to elect candidates of her choice to those bodies. Ms. Arzu resides in central Gwinnett County, just west of the City of Lawrenceville. That area could constitute part of a single-member district containing a sufficient number of Black, Latino, and/or Asian-American voting age citizens to constitute a majority minority population, which would provide a remedy for the existing Section 2 violation.

19.    Plaintiff CLAUDETTE FORBES is a Black resident and registered voter of Gwinnett County, Georgia. As a result of the county's Board of Education districts, and the method of election and districting scheme employed by the Board of Commissioners, Ms. Forbes has been unable to elect candidates of her choice to those bodies in election after election. Ms. Forbes resides in the southern portion of Gwinnett County, at the southern tip of the City of Snellville. That area could constitute part of a single-member district containing a sufficient number of Black,

8

Latino, and/or Asian-American voting age citizens to constitute a majority minority population, which would provide a remedy for the existing Section 2 violation.

20.     Plaintiff JUDY JONES is a Black resident and registered voter of Gwinnett County, Georgia.  As a result of the county's Board of Education districts, and the method of election and districting scheme employed by the Board of Commissioners, Ms. Jones has been unable to elect candidates of her choice to those bodies in election after election.  Ms. Jones resides in central Gwinnett County, just west of the City of Lawrenceville.  That area could constitute part of a single-member district containing a sufficient number of Black, Latino, and/or Asian-American voting age citizens to constitute a majority minority population, which would provide a remedy for the existing Section 2 violation.

21.     Plaintiff DONNA MCLEOD is a Black resident and registered voter of Gwinnett County, Georgia.  As a result of the county's Board of Education districts, and the method of election and districting scheme employed by the Board of Commissioners, Ms. McLeod has been unable to elect candidates of her choice to those bodies in election after election.  Ms. McLeod resides in the central portion of Gwinnett County, just outside the City of Lawrenceville.  That area could constitute part of a single-member district containing a sufficient number of Black, Latino, and/or Asian-American voting age citizens to constitute a majority

minority population, which would provide a remedy for the existing Section 2 violation.

22.    Plaintiff CATALINA ORTIZ is a Latina resident and registered voter of Gwinnett County, Georgia.  As a result of the county's Board of Education districts, and the method of election and districting scheme employed by the Board of Commissioners, Ms. Ortiz has been unable to elect candidates of her choice to those bodies.  Ms. Ortiz resides in the western portion of Gwinnett County, just south of the City of Norcross. That area could constitute part of a single-member district containing a sufficient number of Black, Latino, and/or Asian-American voting age citizens to constitute a majority minority population, which would provide a remedy for the existing Section 2 violation.

23.    Plaintiff LOUISE ("PENNY") POOLE is a Black resident and registered voter of Gwinnett County, Georgia.  As a result of the county's Board of Education districts, and the method of election and districting scheme employed by the Board of Commissioners, Ms. Poole has been unable to elect candidates of her choice to those bodies in election after election.  Ms. Poole resides in the western portion of Gwinnett County, between the Cities of Norcross, Lilburn, and Tucker. That area could constitute part of a single-member district containing a sufficient number of Black, Latino, and/or Asian-American voting age citizens to constitute a

majority minority population, which would provide a remedy for the existing Section 2 violation.

24.     Plaintiff KATHERINE VEGA is a Latina resident and registered voter of Gwinnett County, Georgia.  As a result of the county's Board of Education districts, and the method of election and districting scheme employed by the Board of Commissioners, Ms. Vega cannot elect candidates of her choice to those bodies. Ms. Vega resides in western Gwinnett County, between the Cities of Norcross and Lilburn.  That area could constitute part of a single-member district containing a sufficient number of Black, Latino, and/or Asian-American voting age citizens to constitute a majority minority population, which would provide a remedy for the existing Section 2 violation.

**The Defendants**

25.     Defendant GWINNETT COUNTY BOARD OF COMMISSIONERS, established under the Georgia Constitution and the Official Code of Georgia, is the governing authority of Gwinnett County, a geographical and political subdivision of the State of Georgia located within the Northern District of Georgia.  O.C.G.A. § 36-5-20.  The Board of Commissioners provides local government services in Gwinnett County and has the legislative power to adopt laws affecting its affairs and local government. Defendant GWINNETT COUNTY BOARD OF COMMISSIONERS has the authority to recommend that the Georgia state

legislature adopt districting plans that comply with the Voting Rights Act and United States Constitution.

26.    Defendants CHARLOTTE NASH, JACE BROOKS, LYNETTE HOWARD, TOMMY HUNTER, and JOHN HEARD are the members of the Board of Commissioners.  Each of these Defendants is sued in his or her official capacity.

27.    Defendant GWINNETT COUNTY PUBLIC SCHOOLS (GCPS) is a county school district established under O.C.G.A. § 20-2-50.  GCPS is governed by the Gwinnett County Board of Education, which was established pursuant to O.C.G.A. § 20-2-49.  The Board of Education is responsible for setting policies to lead the operation of the school district, serving as the trustee of public funds, and hiring a superintendent.  Members of the Board of Education have the authority to recommend that the Georgia state legislature adopt districting plans that comply with the Voting Rights Act and United States Constitution.

28.    Defendants CAROLE BOYCE, DANIEL SECKINGER, MARY KAY MURPHY, ROBERT MCCLURE, and LOUISE RADLOFF are members of the Board of Education.  Each of these Defendants is sued in his or her official capacity.

29.    Defendant GWINNETT COUNTY BOARD OF REGISTRATIONS AND ELECTIONS ("BORE") has statutory powers, duties and responsibilities

concerning the conduct of elections held in Gwinnett County. The BORE oversees and is responsible for the administration of elections in the county, including elections for the Board of Commissioners and the Board of Education under the districting plans at issue in this case. O.C.G.A. § 21-2-40.

## FACTS AND BACKGROUND

30.    Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [a minority] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b). An electoral regime that dilutes the voting strength of a minority community may deprive the members of that community of having an equal opportunity to elect representatives of their choice under Section 2.

31.    In Gwinnett County, the percentage of Black, Latino, and Asian-American residents together (53.5%) is significantly greater than the percentage of white residents (44.0%).

32.     The at-large seat and districting plan employed by the Board of Commissioners work in concert to submerge, split up, and divide the county's Black, Latino, and Asian-American voting age citizens so that they are, together, rendered ineffective electoral minorities in every single district.  The county's Black and Latino citizens together and the county's Black and Asian-American citizens are also rendered ineffective electoral minorities in every district.

33.     The Board of Education plan distributes minority citizens so as to produce one district in which Black, Latino, and Asian-American voting age citizens together form a majority, and four other districts in which they are a significant minority.  Black and Latino or Black and Asian voting age citizens together also combine to form a majority in one district, and a significant minority in the other four districts.

34.     The at-large seat and districting plan used to elect the Gwinnett County Board of Commissioners, and the districting plan used to elect the Gwinnett County Board of Education, deny Gwinnett County's Black, Latino, and Asian-American residents, Black and Latino residents, or Black and Asian residents an equal opportunity to participate in the political process and elect representatives of their choice.  They therefore violate Section 2 of the Voting Rights Act.

14

## Demographics of Gwinnett County

35.     According to the 2010 Census, Gwinnett County has a total population of 805,321, a voting age population of 570,614, and a citizen voting age population of approximately 446,842.

36.     The 2010 Census indicates that the non-Latino white total population is 354,316, or 44.0% of the overall total.  The white voting age population is 272,913, or 47.8%, and the white citizen voting age population is approximately 249,012, or about 55.7% of the overall total.

37.     The 2010 Census indicates that the non-Latino Black (alone) total population is 184,122, or 22.9% of the overall total.  The Black voting age population is 122,683, or 21.5%, and the Black citizen voting age population is approximately 111,426, or about 24.9% of the overall total.

38.     The 2010 Census indicates that the non-Latino Asian total population is 84,763, or 10.5% of the overall total.  The Asian voting age population is 62,567, or 11.0%, and the Asian citizen voting age population is approximately 39,465, or about 8.8% of the overall total.

39.     The 2010 Census indicates that the Latino total population is 162,035, or 20.1% of the overall total.  The Latino voting age population is 102,225, or 17.9%, and the Latino citizen voting age population is approximately 39,355, or about 8.8% of the overall total.

40.    The 2010 racial demographics for Gwinnett County, which are the

basis for plaintiffs' proposed alternative redistricting plans, are as follows:

**Table 1 – Gwinnett County Population (2010 Census)[1]**

|  | Total Population | | Voting Age Population | |
|---|---|---|---|---|
| White alone, not Hispanic or Latino | 354,316 | 44.0% | 272,913 | 47.8% |
| Black alone, not Hispanic or Latino | 184,122 | 22.9% | 122,683 | 21.5% |
| Asian alone, not Hispanic or Latino | 84,763 | 10.5% | 62,567 | 11.0% |
| Hispanic or Latino | 162,035 | 20.1% | 102,225 | 17.9% |
| Other | 20,085 | 2.5% | 10,226 | 1.8% |
| Total | 805,321 | | 570,614 | |

41.    According to the 2010-2014 American Community Survey five-year

estimate (2014 ACS), non-Latino whites constitute approximately 42.1% of the

total population, 45.8% of the voting age population, and 54.3% of the citizen

voting age population in Gwinnett County.

---

[1] Source:   U.S. Census, 2010 Census Redistricting Data (Public Law 94-171) Summary Files, *Hispanic or Latino, and Not Hispanic or Latino by Race*, Table P2, *Hispanic or Latino, and Not Hispanic or Latino by Race for the Population 18 Years and Over*, Table P4.

42.     According to the 2014 ACS, non-Latino Black persons constitute approximately 24.2% of the county's total population, 23.5% of its voting age population, and 26.1% of its citizen voting age population.

43.     According to the 2014 ACS, Latinos constitute approximately 20.3% of the county's total population, 17.9% of its voting age population, and 9.2% of its citizen voting age population.

44.     According to the 2014 ACS, non-Latino Asian persons constitute approximately 10.9% of the county's total population, 11.5% of its voting age population, and 8.9% of its citizen voting age population.

45.     Gwinnett County's Black, Latino, and Asian-American populations together combine to predominate in the central, western, and southern portions of Gwinnett County.  The area extends west from Lawrenceville to Norcross, then southeast through Lilburn to the unincorporated area south of Snellville.

46.     Gwinnett County's Black population is concentrated in the Lawrenceville metropolitan area and the unincorporated area south of Snellville near Annistown.  The latter community is located in the southern portion of the county adjacent to DeKalb and Rockdale Counties.

47.     Gwinnett County's Latino population is concentrated in and around the City of Norcross, west of Lawrenceville, and along the I-85 and Georgia Route 316 corridor.

48.     Gwinnett County's Asian-American population is concentrated south of the City of Duluth, and in and around the Cities of Norcross and Lilburn.

49.     Gwinnett County underwent significant demographic changes between 2000 and 2010.  During that period, Census data indicates that the Black population increased by approximately 140%, the Latino population increased by about 153%, and the Asian population increased by more than 100%.

50.     The county's white population decreased by approximately 10% between 2000 and 2010.  The most significant decreases occurred in the southwest portion of the county and in the community located just north of Lawrenceville.

### The Board of Commissioners' Districting Plan

51.     The Board of Commissioners is composed of five commissioners, who are elected to four-year staggered terms.

52.     The Chairman of the Board of Commissioners is elected at large.  The Chairman is elected as a full member of the board of commissioners, serves the same terms of office as other commissioners, and is elected at the same time as the commissioners representing Districts 1 and 3.  The Chairman and other commissioners have equal voting powers.

53.     The commissioners representing Districts 1 through 4 are elected from single-member districts within the county.  The Chairman and the commissioners representing Districts 1 and 3 are elected in presidential election years.  The other

18

commissioners, who represent Districts 2 and 4, are chosen in midterm election years.

54.    Board of Commissioner elections are partisan.  Primary and general elections feature a majority vote requirement.  If no candidate receives a majority of the votes cast, a runoff election is held between the top two candidates.

55.    The Board of Commissioner districts are redrawn after each census. The Board of Commissioners' current districting plan was adopted in 2011 and has been used in each of the following election cycles.

56.    The demographics of the Board of Commissioners' current districting plan are as follows:

**Table 2 – Current Board of Commissioners Districting Plan (2010 Census Data)[2]**

| District | White CVAP % | Black + Latino + Asian CVAP % |
|---|---|---|
| 1 | 52.9% | 45.3% |
| 2 | 55.5% | 42.9% |
| 3 | 59.0% | 39.4% |
| 4 | 55.0% | 43.2% |
| Chair (at-large) | 55.7% | 42.6% |

---

[2] "VAP" stands for voting age population, and "CVAP" stands for citizen voting age population.

57.    Black and Latino persons together, and Black and Asian persons together, do not constitute a majority of the total population, voting age population, or citizen voting age population countywide or in any single-member district.

58.    Black, Latino, and Asian persons together do not constitute a majority of the citizen voting population countywide or in any single-member district.

59.    The Board of Commissioners' districting plan unnecessarily divides Black, Latino, and Asian-American citizens among the four single-member districts, preventing them from combining to form a majority in any district.

60.    A four-member districting plan for the Board of Commissioners could easily be redrawn to create one district in which Blacks, Latinos, and Asian-Americans together constitute more than 65 percent of the citizen voting age population, Blacks and Latinos together constitute more than 57 percent of the citizen voting age population, and Blacks and Asians together constitute more than 51 percent of the citizen voting age population.

61.    A five-member districting plan for the Board of Commissioners could easily be redrawn to create two districts containing a combined Black, Latino, and Asian citizen voting age population of greater than 61 percent, a combined Black and Latino citizen voting age population of greater than 53 percent, and a combined Black and Asian citizen voting age population of greater than 50 percent.

## The Board of Education's districting plan

62.     Gwinnett County's public school system ("GCPS") is nearly but not exactly coterminous with Gwinnett County.  The City of Buford, which is located in the northern portion of Gwinnett County and the southern portion of Hall County, maintains its own public school system.  As a result, GCPS has 11,279 fewer total residents than Gwinnett County, and 8,170 fewer residents of voting age.  Of the City of Buford's 8,170 voting age residents who live in Gwinnett County, 4,936 (60.4%) are white, 1,103 (13.5%) are Black, 1,859 (22.8%) are Latino, and 186 (2.3%) are Asian.

63.     The five members of the Gwinnett County Board of Education are elected from five single-member districts to four-year staggered terms.  The Board members representing Districts 1, 3, and 5 are elected in presidential election years.  The Board members representing Districts 2 and 4 are elected in mid-term election years.

64.     Primary and general elections feature a majority vote requirement.  If no one receives a majority in either election, a runoff election is held between the top two candidates. Board of Education elections are partisan.

65.     The Board of Education's districts are redrawn after each census.  The current districting plan was adopted in 2011 and has been used in each of the following election cycles.

66.   The demographics of the Board of Education's current districting plan

is as follows:

**Table 3 – Current Board of Education Districting Plan (2010 Census Data)**

| District | White CVAP % | Black + Latino + Asian CVAP % |
|---|---|---|
| 1 | 57.9% | 40.5% |
| 2 | 61.9% | 36.4% |
| 3 | 63.7% | 34.7% |
| 4 | 59.3% | 39.1% |
| 5 | 23.6% | 74.4% |
| Total | 55.7% | 42.8% |

67.   Black, Latino, and Asian persons together constitute an overwhelming

majority of the voting age and citizen voting age population in Board of Education

District 5.

68.   The Board of Education's current districting plan packs Black, Latino,

and Asian-American residents into District 5, where they together constitute

approximately 74.4% of the citizen voting age population.  By contrast, only

23.6% of the citizen voting age population in District 5 is white.  Gwinnett

County's remaining Black, Latino, and Asian-American voters are unnecessarily

divided and spread across Districts 1 through 4.  They do not combine to form

more than 40.5 percent of the citizen voting age population in any of the four

districts.

69.     A five-member districting plan for the Board of Education could easily be redrawn to create two districts containing a combined Black, Latino, and Asian-American citizen voting age population of greater than 59 percent, a combined Black and Latino citizen voting age population of greater than 52 percent, and a combined Black and Asian citizen voting age population of greater than 50 percent.  Compact districts can be drawn in a remedial plan while excluding the City of Buford.

## Gwinnett County Election History

70.     Upon information and belief, no Black, Latino, or Asian candidate has ever been elected to a position in the Gwinnett County government.

71.     Since 2002, eight Black, one Asian, and three Latino candidates have run for the Board of Commissioners or the Board of Education and were defeated by white opponents.

72.     The following minority candidates have run for a seat on the Board of Commissioners since 2002 and were defeated: Jose Perez (ran in District 2 in 2010), Robert Byars (ran in District 2 in 2010), Bruce Levell (ran in District 1 in 2008), Earl Hendon (ran in District 3 in 2008), and Euclides Peralta (ran in District 2 in 2002).

73.     During the same period, the following minority candidates have run for a seat on the Board of Education and were defeated: Zachary Rushing (ran in

District 4 in 2014), H.K. Dido (ran in District 5 in 2012), Mark Williams (ran in District 4 in 2010), Jennah Es-Sudan (ran in District 1 in 2012), Ravindra Kumar (ran in District 5 in 2008), Charles Lollar (ran in District 1 in 2004), Alfonso Cardenas (ran in District 1 in 2004).

74.    A statistical analysis demonstrates that voting patterns in Board of Commissioners and Board of Education elections are racially polarized, with Black, Latino, and Asian-American voters consistently voting cohesively in support of the same candidates of choice.  White bloc voting in support of different candidates has repeatedly led to the defeat of minority candidates preferred by Black, Latino, and Asian-American voters.

### The Redistricting Process

75.    The districting plans for the Board of Commissioners and the Board of Education were prepared in 2011, with input from the members of the two bodies, by the Georgia Legislative & Congressional Reapportionment Office ("GLCRO").

76.    In August of 2011, the Georgia House and Senate passed H.B. 31EX, which redistricted the Board of Education, and S.B. 7EX, which redistricted the Board of Commissioners.

77.    On September 21, 2011, Georgia Governor Nathan Deal signed both H.B. 31EX and S.B. 7EX into law.

78.     Gwinnett County subsequently submitted both redistricting plans for preclearance pursuant to Section 5 of the Voting Rights Act.  The U.S. Department of Justice precleared the Board of Commissioners' plan on December 28, 2011, and the Board of Education's plan on January 20, 2012.  The standard of review used under Section 5 is different than the standard under Section 2.  Under Section 5, a jurisdiction must show that its voting change was neither adopted with a discriminatory purpose nor would have a discriminatory effect.  52 U.S.C. § 10304(a).  The "effect" standard prohibits backsliding, i.e., it bars any change "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976).  Preclearing a voting change does not preclude a subsequent action under Section 2.  *Id.* § 10304(a) ("Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure").

### *Thornburg v. Gingles*

79.     The United States Supreme Court, in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986), identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights

Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it... usually to defeat the minority's preferred candidate."

80.     Black, Latino, and Asian-American residents together are sufficiently numerous and geographically compact to form a majority of the total population, voting age population, and citizen voting age population of two properly-apportioned single-member Board of Commissioner and Board of Education districts in a five-district plan.

81.     Black and Latino residents together are sufficiently numerous and geographically compact to form a majority of the total population, voting age population, and citizen voting age population of two properly-apportioned single-member Board of Commissioner and Board of Education districts in a five-district plan.

82.     Black and Asian-American residents together are sufficiently numerous and geographically compact to form a majority of the citizen voting age population of two properly-apportioned single-member Board of Commissioner and Board of Education districts in a five-district plan.

83.     Black, Latino, and Asian-American residents together are sufficiently numerous and geographically compact to form a majority of the total population,

voting age population, and citizen voting age population of one properly-apportioned single-member Board of Commissioner district in a four-district plan.

84.    Black and Latino residents together are sufficiently numerous and geographically compact to form a majority of the total population, voting age population, and citizen voting age population of one properly-apportioned single-member Board of Commissioner district in a four-district plan.

85.    Black and Asian-American residents together are sufficiently numerous and geographically compact to form a majority of the citizen voting age population of one properly-apportioned single-member Board of Commissioner district in a four-district plan.

86.    Gwinnett County's Black, Latino, and Asian-American voters vote together and are politically cohesive as one single coalition minority group. Together, they vote overwhelmingly for different candidates that those supported by white voters.  Black, Latino, and Asian-American voters together commonly support minority candidates over others.

87.    Gwinnett County's Black and Latino voters vote together and are politically cohesive as one single coalition minority group.  Together, they vote overwhelmingly for different candidates than those supported by white voters. Black and Latino voters together commonly support minority candidates over others.

27

88.    Gwinnett County's Black and Asian-American voters vote together and are politically cohesive as one single coalition minority group.  Together, they vote overwhelmingly for different candidates than those supported by white voters. Black and Asian-American voters together commonly support minority candidates over others.

89.    Black voters, Latino voters, and Asian-American voters are politically cohesive as individual minority groups when not combined with each other in a coalition minority group. .

90.    Gwinnett County's white electorate votes as a bloc in support of different candidates than those supported by Black, Latino, and Asian-American voters together, Black and Latino voters together, or Black and Asian-American voters together.  Bloc voting by white members of the electorate consistently defeats the candidates preferred by Black, Latino, and Asian-American voters, Black and Latino voters, or Black and Asian-American voters.  This generally explains why Black, Latino, and Asian-American candidates for the Board of Commissioners and the Board of Education have been defeated by white opponents.

91.    Black, Latino, and Asian-American community groups and organizations work together in coalitions to engage in voter registration and get out the vote efforts in Gwinnett County.  For example, GALEO, the Georgia NAACP,

and the Gwinnett County Branch NAACP join Asian- American and other civic

engagement groups to hold voter registration drives and promote events such as

National Voter Registration Day. *See, e.g.,* "GALEO Joins Other Civic

Engagement Groups promoting 'National Voter Registration Day,'" GALEO

website, *available at* http://www.galeo.org/galeo-joins-civic-engagement-groups-

promoting-national-voter-registration-day/; "Non-Profit Civic Engagement

Organizations Team Up for 'National Voter Registration Day' to Stress

Importance of Voting in State Elections," Partnership for Southern Equity website,

*available at* http://partnershipforsouthernequity.org/index.php/news/98-non-profit-

civic-engagement-organizations-team-up-for-national-voter-registration-day-to-

stress-importance-of-voting-in-state-elections; "NAACP & GALEO Team up for

Gwinnett County Library Cards and Voter Registration," GALEO website,

*available at*

http://webcache.googleusercontent.com/search?q=cache:wthnOgya9zAJ:galeo.org/

old/event.php%3Fevent_id%3D0000000145+&cd=2&hl=en&ct=clnk&gl=us.

92.    GALEO and the Gwinnett County NAACP have jointly met with the

Gwinnett County Board of Registrations and Elections to promote voter

registration and education efforts, and to devise a plan for voter outreach.  Minutes

from the Gwinnett County Board of Registrations and Elections' meeting held on

June 20, 2013, *available at*

https://www.gwinnettcounty.com/static/upload/bac/6/20130620/m_meeting_minut
es_062013.pdf.

93.    GALEO also collaborated with Asian-Americans on registering voters
at naturalization ceremonies in Gwinnett County between 2012 and 2014, and
plans on resuming that collaboration in the near future.

94.    Asian-Americans have also participated in voter registration drives
and canvassed in Gwinnett County alongside the Somali American Community
Center in 2014.

95.    Black, Latino, and Asian-American citizens of Gwinnett County share
common political interests.  Black, Latino, and Asian-American individuals and
groups have worked together on political campaigns and community advocacy
efforts.

96.    For example, a coalition including the Georgia Latino Alliance for
Human Rights (GLAHR), the U.S. Human Rights Network, and Black Lives
Matter, Project South and Southerners on New Ground, has mobilized under the
hashtag #Not1More in response to immigration raids conducted by the Department
of Homeland Security in Lawrenceville, Lilburn, and Norcross (among other
places) in January of 2016.  Jeremy Redmon, *Seven immigrant families from
Georgia freed from detention after raids*, THE ATLANTA JOURNAL-CONSTITUTION,
Feb. 9, 2016, *available at* http://www.ajc.com/news/news/state-regional-govt-

politics/seven-immigrant-families-from-georgia-freed-from-d/nqMYM/; Nigel

Duara and Molly Hennessy-Fiske, *Families are taken into custody as push to*

*deport immigrants denied refuge begins*, LOS ANGELES TIMES, Jan. 3, 2016,

*available at* http://www.latimes.com/nation/immigration/la-na-ff-immigration-

raids-20160103-story.html.  Project South has organized in Georgia and put out a

statement, signed by Black elected officials, clergy, and other community leaders,

condemning the immigration raids.  Statement Condemning the Raids, *available at*

http://projectsouth.org/statement-condemning-the-raids/.

97.    Examples of coalitional work between Gwinnett County's Black,

Latino, and Asian-American community groups and organizations abound.  In

2015, African American and Asian-American groups conducted a candidate forum

and held a joint Deferred Action for Childhood Arrivals/Deferred Action for

Parents of Americans and Lawful Permanent Residents with GLAHR.  Both events

were held in Gwinnett County.

98.    Gwinnett County's Latino and Asian-American communities share

similar needs and aspirations. They are also united by common economic interests,

work, and the continuing battle for many to obtain or maintain legal status or

citizenship in the United States.  For example, CPACS, formerly called the Center

for Pan Asian Community Services, changed its name and expanded its programs

and services to include Hispanic residents of Gwinnett County.  There are

significant ties in the economic sphere; for example, "the Hispanic workforce incorporates well into Asian supermarkets and restaurants." Exequiades Chirinos, *Nuestra Comunidad: Hispanic and Asian communities unite*, THE ATLANTA JOURNAL-CONSTITUTION, Mar. 25, 2016, *available at* http://www.ajc.com/news/news/local/nuestra-comunidad-hispanic-and-asian-communities-u/nqr64/.

99.    The Gwinnett Parent Coalition to Dismantle the School to Prison Pipeline (Gwinnett SToPP) is another example of a response to issues facing minority community members.  The organization was formed in 2007 "to answer growing frustration" with Gwinnett County Public Schools and in particular to combat the "trend wherein students are funneled out of their regular education setting and into alternative education and criminal justice systems.  The STPP disproportionately affects students of color, students with disabilities, males, and students from low-wealth backgrounds."  History, *available at* http://www.gwinnettstopp.org/about-us/history/.

### Section 2's Totality of the Circumstances Analysis

100.   In addition to the presence of the three *Gingles* preconditions, the totality of the circumstances in this case supports plaintiffs' claim that Black, Latino, and Asian-American voters have less opportunity than other members of the electorate to participate in the political process and elect candidates of choice to

the Gwinnett County Board of Commissioners and Board of Education, in

violation of Section 2 of the Voting Rights Act.

101.   There is a majority vote requirement in all elections in Georgia, which

makes it more difficult for Black, Latino, and Asian-American voters to elect

candidates of choice because they comprise a minority of the electorate.

102.   There is a long—and well documented—history of voting

discrimination against Blacks in Georgia.  Indeed, the Northern District of Georgia

has recently acknowledged "Georgia's long history of discrimination" in this area.

*Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs,* 950 F.

Supp. 2d 1294, 1314-16 (N.D. Ga. 2013) (*citing Brooks v. State Bd. of Elections,*

848 F.Supp. 1548, 1560–61, 1571 (S.D. Ga. 1994) (stating that Georgia's

"segregation practice and laws at all levels has been rehashed so many times that

the Court can all but take judicial notice thereof")), *vacated and remanded on*

*other grounds*, 775 F.3d 1336 (11th Cir. 2015); *see also Johnson v. Miller*, 864 F.

Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded,* 515 U.S. 900 (1995)

(noting that "we have given formal judicial notice of the State's past discrimination

in voting, and have acknowledged it in the recent cases").

103.   Voting-related discrimination against Latinos and Asian-Americans in

Georgia is of a more recent vintage, and is tied to recent population growth in the

state.  One recent example includes the voter citizenship verification program

33

adopted shortly before the 2008 presidential election by the Georgia Secretary of State's office in violation of Section 5 of the Voting Rights Act. *Morales v. Handel*, 2008 WL 9401054, C.A. No. 1:08-CV-3172 (N.D. Ga. 2008). The initial version of the program relied on error-laden and "possibly improper" usage of the Social Security Administration's HAVV system and outdated Georgia Department of Driver Services data in an attempt to find non-citizens. Letter from Loretta King, Acting Asst't Att'y Gen., Dep't of Justice, to Ga. Att'y Gen. Thurbert E. Baker, May 29, 2009, *available at* http://www.justice.gov/crt/voting-determination-letters-georgia. It caused thousands of legitimately naturalized citizens (as well as many natural-born citizens) to be incorrectly flagged as ineligible non-citizens. The program had a particularly significant impact on Gwinnett County. According to the 2010 Census, the county is home to 19.0 percent of Georgia's Latino population and 27.2 percent of the state's Asian-American population.

104. More recently, Latino and Asian-American organizations mobilized to fight against Senate Resolution 675 (2016), which sought to amend the Georgia Constitution to make English the state's official language and prohibit, among other things, the use of any language other than English in any Georgia state or local government document, proceeding, or publication. GALEO, the Latin American Association of Atlanta, the Global Indian Business Council, the Korean-

34

American and Philippine-American Chambers of Commerce were among

approximately 200 ethnic business groups, churches, and other organizations, that

condemned and lobbied against SR 675, with GALEO emphasizing the bill's

potential impact on the provision of bilingual election materials in Gwinnett and

Hall Counties.  The resolution passed the Georgia Senate but failed in the House

prior to the end of the legislative session.  Jeremy Redmon, *Georgia House panel*

*blocks English-only amendment to constitution*, THE ATLANTA JOURNAL-

CONSTITUTION, Mar. 10, 2016, *available at*

http://www.ajc.com/news/news/local/nuestra-comunidad-hispanic-and-asian-

communities-u/nqr64/; D.A. King, ALL ON GEORGIA CANDLER COUNTY, Jan. 19,

2016, *available at* http://candler.allongeorgia.com/galeo-strikes-again-corporate-

funded-anti-english-group-demands-foreign-language-voter-ballots-in-georgia/;

"Asian Americans Advancing Justice Atlanta Media Alert," *Press Conference –*

*Ethnic Chambers of Commerce Oppose Anti-Immigrant Bills*, *available at* Mar. 9,

2016, http://us2.campaign-

archive2.com/?u=c07af679cb8d889c8f33cb996&id=e13213b1a0.

105.   The Gwinnett County Board of Registrations and Elections ("BORE")

is currently infringing on the voting rights of limited-English proficient Latino

voters by implementing a policy and practice of failing to provide bilingual ballots

and election materials at county elections.  A question on the BORE's FAQ

website asks if the county "provide[s] language assistance at polling locations."
The response: "No.  Voters who have a limited proficiency of the English language
may bring someone to assist them with the voting process." *Elections and Voting:
Frequently Asked Questions*, *available at*
https://www.gwinnettcounty.com/portal/gwinnett/Departments/Elections/Frequentl
yAskedQuestions/ElectionsandVoting.

106.   On January 19, 2016, the BORE voted to deny a request made by
GALEO and LatinoJustice to provide Spanish language ballots at future elections.
The Chair of the BORE stated that the body would not provide bilingual ballots or
voting materials unless it was required to by the state, federal officials, or a court.
David Wickert, *Gwinnett rejects call for Spanish ballots*, THE ATLANTA JOURNAL-
CONSTITUTION, Jan. 19, 2016, *available at* http://www.ajc.com/news/news/local-
govt-politics/gwinnett-rejects-call-for-spanish-ballots/np7zC/.

107.   The BORE does not provide Spanish language ballots or election
materials to voters even though 2010 Census data indicates that 9,315 Latino
citizens of voting age in Gwinnett County have limited English proficiency
(VACLEP).  October 13, 2011 Section 203 determinations summary and
comparison tables, *available at*
https://www.census.gov/rdo/data/voting_rights_determination_file.html.  The
number of VACLEP Latinos is just shy of the trigger (10,000 VACLEP) that

would mandate coverage for Gwinnett County under Section 203 of the Voting Rights Act.  52 U.S.C. § 10503(b)(2)(A).  If the county was covered for Spanish under Section 203, the BORE would be required to provide Spanish language election materials and assistance for all Gwinnett County elections.  52 U.S.C. §§ 10503(b)(1) and 10503(c).

108.   The BORE's actions also implicate Section 4(e) of the Voting Rights Act, which provides that the right to register and vote may not be denied to those individuals who have completed the sixth grade in a public school, such as those in Puerto Rico, where the predominant classroom language is a language other than English.  52 U.S.C. § 10303(e).  The 2014 ACS indicates that Gwinnett County has 13,263 Puerto Rican residents.  U.S. Census Bureau, 2010-2014 American Community Survey 5-Year Estimates, Table DP05.  There is no minimum number of affected Puerto Ricans that triggers the language minority provisions of Section 4(e).  52 U.S.C. § 10303(e).

109.   The BORE does not provide bilingual ballots or election materials in any language spoken by Asian-American voters, even though Census data indicates that 2,290 Indian-American, 2,180 Chinese-American, 4,205 Korean-American, and 4,520 Vietnamese-American citizens of voting age in Gwinnett County have limited English proficiency.  Each of those four totals is the highest among all counties in Georgia.  Gwinnett County has 15,265 limited English

37

proficiency Asian-American citizens of voting age, while no other county in Georgia has as many as 5,000 such individuals. October 13, 2011 Section 203 determinations summary and comparison tables, *available at* https://www.census.gov/rdo/data/voting_rights_determination_file.html.

110.   The history of voting discrimination against minority voters in Georgia between 1982 and 2006 is further detailed in various reports produced during the 2006 reauthorization of the Voting Rights Act.  *See* Am. Civil Liberties Union, *The Case for Extending and Amending the Voting Rights Act* 108-479, *available at* https://www.aclu.org/files/pdfs/votingrightsreport20060307.pdf; RenewtheVRA.org, *Voting Rights in Georgia 1982-2000*, *available at* http://www.protectcivilrights.org/pdf/voting/GeorgiaVRA.pdf.  Additional evidence of voting discrimination can be found in various academic articles and books.  *See, e.g.*, Laughlin McDonald et al., *Georgia*, *in* QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT 1965-1990 67-102 (Chandler Davidson & Bernard Grofman eds., 1994).

111.   Gwinnett County's Black, Latino, and Asian-American voters have lower rates of voter registration and turnout compared to their white counterparts.

112.   Black, Latino, and Asian-American voters in Gwinnett County continue to bear the effects of discrimination, which hinder their ability to participate effectively in the political process.  As a result of the history of official

and private discrimination in Gwinnett County, Black, Latino, and Asian-American residents lag behind white residents in a wide range of socioeconomic indicators, including income, poverty status, educational attainment, and access to health care.

113. Gwinnett County's Black and Latino residents have significantly lower rates of educational attainment than white residents and have significantly higher rates of poverty and unemployment than those of white residents. Gwinnett County's Asian-American residents over the age of 25 have a significantly lower high school graduation rate compared to their white counterparts. The county's Asian-American residents have significantly higher rates of poverty and of receiving food stamps or SNAP benefits.

114. Not only have Gwinnett County voters never elected any Black, Latino, or Asian-American candidate to county office, but the county's elected officials are unresponsive to the needs of the county's Black, Latino, and Asian-American citizens.

115. GCPS "lags behind most other major metro districts" when it comes to diversity in hiring teachers, administrators, and principals. While a majority of students are non-white, almost eight in ten teachers and seven in ten administrators and principals are white. Minority teachers and administrators have reported feeling frustrated by their lack of progress and have filed discrimination complaints

or considered leaving the district.  D. Aileen Dodd, *System lags in minority hiring*, THE ATLANTA JOURNAL-CONSTITUTION, Mar. 4, 2012.

116.   Minority students in the County's schools continue to face discrimination through the disproportionate use of school discipline on students of color, which contributes to pushing children out of their public schools and into the juvenile and criminal justice systems.  For example, while approximately 30 percent of GCPS students are Black, they constitute about fifty percent of students who are suspended.  Eric Stirgus, *Racial disparities in school punishment concern black students*, THE ATLANTA JOURNAL-CONSTITUTION, Jan. 29, 2016, *available at* http://www.myajc.com/news/news/local-education/racial-disparties-in-school-punishment-concern-bla/np55r/; *see also* Gwinnett SToPP, *Securing the Education Pipeline for Georgia's Children through Community-Empowered Local School Councils*, February 2015, *available at* http://www.gwinnettstopp.org/wp-content/uploads/LSC-Securing-the-Education-Pipeline-Report.pdf.  GCPS administrators suspended more than three times as many black students per capita as white students last year.  Rose French & Jeff Ernsthausen, *In Georgia, as in U.S., race affects school discipline*, THE ATLANTA JOURNAL-CONSTITUTION, Jan. 18, 2016, *available at* http://www.myajc.com/news/news/local-education/in-georgia-as-in-us-race-affects-school-discipline/ncq3g/.

117.   In an August 2008 workshop, GCPS Superintendent J. Alvin Wilbanks suggested that black students were the reason school discipline has been an issue in Gwinnett County.  Several current board members publicly supported Mr. Wilbanks, who made subsequent remarks that the Gwinnett County NAACP president also considered to be offensive.  D. Aileen Dodd, *Gwinnett NAACP joins fray*, THE ATLANTA JOURNAL-CONSTITUTION, Sept. 11, 2008.  Mr. Wilbanks remains the GCPS superintendent.

118.   The Board of Commissioners voted to authorize funding for a Memorandum of Agreement (MOA) with U.S. Immigration and Customs Enforcement (ICE) in September of 2008.  Gwinnett County is one of a handful of Georgia counties to enter into such an agreement.  U.S. Immigration and Customs Enforcement, Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act, *available at* https://www.ice.gov/factsheets/287g.  The MOA with ICE allows the county sheriff's department to "identify and place detainers on illegal criminal aliens" and perform other functions of immigration officers.  Press release, 287(g), *available at* http://www.gwinnettcountysheriff.com/?p=984.  The Gwinnett County Jail is the facility with the highest number of detainers issued since 2007 (13.9%) in Georgia, and is the only county jail to issue more than the Georgia State Department of Corrections.  AM. CIVIL LIBERTIES UNION OF GA., *Prejudice, Policing, and Public Safety: The Impact of Immigration Hyper-*

*Enforcement in the State of Georgia* at 16, *available at*

http://www.acluga.org/files/2214/0665/8393/GA_Prejudice-Policing_WEB.pdf.

119.   These detainers, which have increased 953% statewide between 2007

and 2013, disproportionately affect people of color.  *Id.* at 2; Azadeh Shahshahani,

*Georgia teams up with ICE to target Latinos*, AL JAZEERA AMERICA, Aug. 8, 2014,

*available at* http://america.aljazeera.com/opinions/2014/8/georgia-ice-

latinosundocumentedimmigrantsdiscrimination.html (noting that the percentage of

individuals placed on an immigration hold who were described as having dark or

medium complexion increased from 66.7% in 2007 to 96.4% in 2013).  Minority

community members report being repeatedly questioned or pulled over by law

enforcement without cause.  Latinos avoid certain parts of Gwinnett County

because they believe they are being racially profiled.  AM. CIVIL LIBERTIES UNION

OF GA., *The Persistence of Racial Profiling in Gwinnett: Time for Accountability,*

*Transparency, and an End to 287(g)*, *available at*

https://www.acluga.org/sites/default/files/gwinnett_racial_profiling_report_1.pdf.

120.   In 2006, Gwinnett County judges estimated that up to 25 percent of

their cases involved "illegal immigrants," and asked the state legislature to add

another judge to the county superior court because "the large number of non-

English speakers means cases take longer."  *Court pleads for help with illegals*,

GWINNETT DAILY POST, Dec. 14, 2006, *available at*

42

http://www.gwinnettdailypost.com/archive/court-pleads-for-help-with-illegals/article_d1fd7e17-cead-50ff-92a1-6d37c735fd52.html/.

121.   In June of 2016, the Board of Commissioners unanimously voted to renew the MOA with ICE for another three years.  The Board of Commissioners provided no opportunity for public debate before voting on the measure, upsetting Latino community members who believe the program lends itself to racial profiling.  Laura Thompson, *Gwinnett immigration checks to continue*, THE ATLANTA JOURNAL-CONSTITUTION, June 28, 2016, *available at* http://digital.olivesoftware.com/Olive/ODE/AtlantaJournalConstitution/LandingPage/LandingPage.aspx?href=QUpDLzIwMTYvMDYvMjg.&pageno=MjM.&entity=QXIwMjMwMw..&view=ZW50aXR5.

## COUNT ONE:
## VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT OF 1965

122.   Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 121 above, as if fully set forth herein.

123.   As explained in detail above, Gwinnett County's Black, Latino, and Asian-American population is together sufficiently numerous and geographically compact to allow for the creation of two properly-apportioned single-member districts for electing members to the Board of Commissioners and the Board of Education in a five-district plan.  In both districts, the Black, Latino, and Asian-American population together constitutes a majority of the total population, voting

age population, and citizen voting age population.  Even under the existing four-district, one at-large Board of Commissioners method of election, the county's Black, Latino, and Asian-American population is together sufficiently numerous and geographically compact to allow for the creation of one properly-apportioned single-member district.

124.   Alternatively, Gwinnett County's Black and Latino population, or its Black and Asian-American population, are together sufficiently numerous and geographically compact to allow for the creation of two properly-apportioned single-member districts for electing members to the Board of Commissioners and the Board of Education in a five-district plan, or one single-member district in a four-district Board of Commissioners plan.  In each remedial district, the Black and Latino population together, or the Black and Asian-American population together, constitutes a majority of the citizen voting age population.

125.   The county's Black, Latino, and Asian-American voters together, Black and Latino voters together, or Black and Asian-American voters together are politically cohesive, and county elections reflect a clear pattern of racially polarized voting that allows the bloc of white voters to usually defeat the minority's preferred candidate.  These facts satisfy the three "*Gingles* preconditions."

44

126.   The totality of the circumstances establishes that the use of an at-large seat for the Board of Commissioners, and the current district boundaries for the Board of Commissioners and Board of Education, have the effect of denying Black, Latino, and Asian-American voters, who form a single minority group, or Black and Latino voters together or Black and Asian-American voters together, an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

127.   Unless enjoined by order of this Court, Defendants will continue to act in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Board of Commissioners and the Board of Education using unlawful districting plans and, in the case of the Board of Commissioners, an at-large seat.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that the Court:

a.   Declare that the use of an at-large seat and the current districting plan to elect the Gwinnett County Board of Commissioners violates Section 2 of the Voting Rights Act;

b.   Declare that the districting plan used to elect the Gwinnett County Board of Education violates Section 2 of the Voting Rights Act;

45

c.  Enjoin Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections in Gwinnett County, Georgia, under the method of election and districting plan employed by the Board of Commissioners;

d.  Enjoin Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections in Gwinnett County, Georgia, under the current districting plan employed by the Board of Education;

e.  Order the implementation of a new method of election and districting plan for the Board of Commissioners that complies with Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

f.  Order the implementation of a new districting plan for the Board of Education that complies with Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

g.  Award plaintiffs their reasonable attorneys' fees, pursuant to statute, and the costs and disbursements of maintaining this action, such as expert fees; and

h.  Order such additional relief as the interests of justice may require.

Dated: August 8, 2016        Respectfully submitted,

By:           _____

Brian J. Sutherland
Georgia Bar 105408
Buckley Beal, LLP
1230 Peachtree Street, N.E., Suite #900
Atlanta, GA 30309
Telephone:  (404) 781-1100
Facsimile:   (404) 781-1101

Ezra D. Rosenberg, Esq. (*pro hac vice – to be filed*)
New Jersey Bar No. 012671974
Julie Houk, Esq. (*pro hac vice – to be filed*)
California Bar No. 114968
John Powers, Esq. (*pro hac vice – to be filed*)
District of Columbia Bar No. 1024831
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
jpowers@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., NW, Suite 400
Washington, D.C. 20005
Telephone:  (202) 662-8600
Facsimile:   (202) 783-0857

April N. Ross, Esq. (*pro hac vice – to be filed*)
District of Columbia Bar No. 500488
Clifford J. Zatz, Esq. (*pro hac vice – to be filed*)
District of Columbia Bar No. 298596
aross@crowell.com
czatz@crowell.com
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Telephone:  (202) 624-2500
Facsimile:   (202) 628-5116

*Counsel for Plaintiffs*

47