# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GEORGIA STATE CONFERENCE OF
THE NAACP, as an organization; et al.,

      Plaintiffs,

v.

GWINNETT COUNTY BOARD OF
REGISTRATIONS AND ELECTIONS;
et al.,

      Defendants.

Civil Action No.
1:16-cv-02852-AT

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**<u>TABLE OF CONTENTS</u>**          **<u>Page(s)</u>**

Table of Authorities ................................................................................. ii

INTRODUCTION ....................................................................................1

I.      PLAINTIFFS' THIRD AMENDED COMPLAINT INCLUDES SPECIFIC ALLEGATIONS CONCERNING STANDING AND REMEDY AS DIRECTED BY THE COURT .........................................2

II.     PLAINTIFFS HAVE STANDING ...........................................................4

        1.     The Legal Standard for Standing in Vote Dilution Cases ...............4

        2.     The Individual Plaintiffs Have Standing..........................................8

        3.     Multiple Single-Member Districts Can Dilute a Single Minority Population Center ..........................................................10

        4.     Plaintiffs Do Not Need to Live in Each Dilutive District to Have Standing .................................................................................12

        5.     Defendants Failed to Establish that Voter-Plaintiffs Do Not Have Standing as a Matter of Law....................................................13

        6.     Organizational Plaintiffs Have Standing .......................................16

III.    PLAINTIFFS' PROPOSED REMEDIES ARE VIABLE .......................18

        1.     Plaintiffs Do Not Need to Produce a Remedial Map at this Stage ...................................................................................18

        2.     Plaintiffs Do Not Need to Devise the Final Remedy at this Stage ...................................................................................20

        3.     The Minimum Change Rule Does Not Apply at this Stage, but Plaintiffs' Proposed Remedies Comply Nonetheless ..............22

        4.     Plaintiffs' Proposed Remedies Do Not Change the Board Commissioners' Form of Government ..........................................24

CONCLUSION.......................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Johnson*,
  521 U.S. 74 (1997)............................................................................................20

*Anderson v. Mallamad*,
  No. IP-94-1447, 1997 WL 35024766 (S.D. Ind. Mar. 28, 1997) ......................12

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*,
  No. 03-CV-502, 2003 WL 21524820 (N.D.N.Y. July 3, 2003) ........................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................17

*Askew v. City of Rome*,
  127 F.3d 1355 (11th Cir. 1997) ........................................................................10

*Baker v. Carr*,
  369 U.S. 186 (1962)........................................................................................5, 12

*Barnett v. City of Chicago*,
  1996 WL 34432 (N.D. Ill. Jan. 29, 1996)........................................................6, 7

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................17

*Benavidez v. City of Irving*,
  638 F. Supp. 2d 709 (N.D. Tex. 2009) ................................................................5

*Bonilla v. Chicago*,
  809 F. Supp. 590 (N.D. Ill. 1992)......................................................................18

*Bridgeport Coal. For Fair Representation v. City of Bridgeport*,
  26 F.3d 271 (2d Cir. 1994) ................................................................................15

*Broward Citizens for Fair Districts v. Broward Cty.*,
  No. 12-601317-CIV, 2012 WL 1110053 (S.D. Fla. Apr. 3, 2012) ............*passim*

*Collins v. Fulton Cty. Sch. Dist.*,
  No. 1:12-CV-1299, 2012 WL 7802745 (Dec. 26, 2012)......................................1

**Page(s)**

*Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*,
906 F.2d 524 (11th Cir. 1990) ...........................................................15

*Davis v. Chiles*,
139 F.3d 1414 (11th Cir. 1998) .......................................................16

*Dillard v. Baldwin Cty. Comm'rs*,
225 F.3d 1271 (11th Cir. 2000) ...........................................................7

*Dillard v. Chilton Cty. Comm'n*,
495 F.3d 1324 (11th Cir. 2007) ...........................................................7

*Dillard v. Crenshaw Cty., Ala.*,
831 F.2d 246 (11th Cir. 1987) ...........................................................21

*Fairley v. Hattiesburg, Miss.*,
584 F.3d 660 (5th Cir. 2009) ....................................................18, 20

*Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*,
996 F. Supp. 2d 1353 (N.D. Ga. 2014)..............................................20

*Garza v. Cty. of Los Angeles*,
918 F.2d 763 (9th Cir. 1990) ...........................................................11

*Georgia State Conf. of the NAACP v. Fayette Cty. Bd. of Com'rs*,
950 F. Supp. 2d 1294 (N.D. Ga. 2013)..............................................10

*Gladstone Realtors v. Vill. of Bellwood*,
441 U.S. 91 (1978).............................................................................9

*Hall v. Louisiana*,
974 F. Supp. 2d 978 (M.D. La. 2013)................................................18

*Harris v. City of Zion*,
927 F.2d 1401 (7th Cir. 1991) ...........................................................4

*Hunt v. Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977)..........................................................................14

*Johnson v. DeGrandy*,
512 U.S. 997 (1994)..........................................................5, 6, 10, 14

# TABLE OF AUTHORITIES

*Johnson v. Hamrick*,
    196 F.3d 1216 (11th Cir. 1999) ........................................................10

*Lawrence v. Dunbar*,
    919 F.2d 1525 (11th Cir. 1990) .........................................................4

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).............................................................................4

*LULAC v. Midland Indep. Sch. Dist.*,
    812 F.2d 1494 (5th Cir. 1987) ..........................................................16

*Luna v. County of Kern*,
    No. 1:16-cv-568, 2016 WL 4679723 (E.D. Cal. Sept. 6, 2016)..................16, 17

*Meek v. Metro. Dade Cty., Fla.*,
    985 F.2d 1471 (11th Cir. 1993) ..........................................................7

*Montes v. City of Yakima*,
    40 F. Supp. 3d 1377, 1399 (E.D. Wash. 2014)...........................18, 20

*Nipper v. Smith*,
    39 F.3d. 1494 (11th Cir. 1994) ....................................................16, 18

*Perez v. Abbott*,
    250 F. Supp. 3d 123 (W.D. Tex. 2017) ............................................11

*Pope v. Cty. of Albany*,
    No. 1:11-cv-0736, 2014 WL 316703 (N.D.N.Y. Jan. 28, 2014)..........5, 6, 13, 14

*Public Citizen, Inc. v. Miller*,
    992 F.2d 1548 (11th Cir. 1993) ..........................................................8

*Resnick v. AvMed, Inc.*,
    693 F.3d 1317 (11th Cir. 2012) ..........................................................1

*Rios-Andino v. Orange Cty.*,
    51 F. Supp. 3d 1215, 1226 (M.D. Fla. 2014)....................................10

*Rodriguez v. Pataki*,
    308 F. Supp. 2d 346 (S.D.N.Y. 2004) .........................................11, 12

# TABLE OF AUTHORITIES

*S. Christian Leadership Conf. v. Sessions*,
  56 F.3d 1281 (11th Cir. 1995) ..........................................................16

*Smith v. Cobb Cty. Bd. of Elecs. and Registrations*,
  314 F. Supp. 2d 1274 (N.D. Ga. 2002)..............................................20

*Solomon v. Liberty Cty., Fla.*,
  899 F.2d 1012 (11th Cir. 1990) ..........................................................7

*Thornburg v. Gingles*,
  478 U.S. 30 (1986).................................................................*passim*

*United States v. Euclid City School Bd.*,
  632 F. Supp. 2d 740 (N.D. Ohio 2008) ...........................................19

*United States v. Hays*,
  515 U.S. 737 (1995)...........................................................12, 13, 14

*United States v. Osceola Cty., Fla.*,
  475 F. Supp. 2d 1220 (M.D. Fla. 2006)............................................17

*United States v. Vill. of Port Chester*,
  704 F. Supp. 2d 411 (S.D.N.Y. 2010) ..............................................19

*Upham v. Seamon*,
  456 U.S. 37 (1982)........................................................................19, 20

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252, 264 n.9 (1977) ..............................................................9

*Voinovich v. Quilter*,
  507 U.S. 146, 153-54 (1993) ............................................................16

*Whitcomb v. Chavis*,
  403 U.S. 124 (1971).............................................................................5

*White v. Weiser*,
  412 U.S. 783 (1973).....................................................................19, 20

*Wilson v. Minor*,
  220 F.3d 1297 (11th Cir. 2000) ...............................................*passim*

# TABLE OF AUTHORITIES

**Page(s)**

*Wright v. Dougherty Cty., Ga.,*
  358 F.3d 1352 (11th Cir. 2004) ..................................................12, 13

*Wright v. Sumter Cty. Bd. of Elecs. and Registration,*
  657 Fed. App'x 871 (11th Cir. 2016) .............................................17

**Statutes**

52 U.S.C. § 10302 ..........................................................................4

Voting Rights Act .......................................................................4, 19

Section 2 of the Voting Rights Act of 1965.......................................*passim*

**Other Authorities**

Fed. R. Civ. P. 8(a)........................................................................3

Federal Rule 12(b)(1)......................................................................4

## INTRODUCTION

Plaintiffs submit this Memorandum of Law in opposition to Motions to Dismiss filed by Defendants Gwinnett County School District (the "School District"), Gwinnett County, Georgia (the "County"), and the Gwinnett County Board of Registrations and Elections ("BORE," and together with the County, the "County Defendants").  (Docs. 170, 170-1, 171.)  For the reasons set forth below, Defendants' Motions must be denied because (1) the individual and organizational Plaintiffs have standing to assert their claims for vote dilution in violation of Section 2 of the Voting Rights Act of 1965 and (2) Plaintiffs seek remedial plans that this Court is authorized to require if a Section 2 violation is established.  Defendants' suggested pleading requirements, in addition to being contrary to established law, would have the practical effect of denying voters and organizations concerned with protecting voting rights meaningful access to the courts.

In ruling on a motion to dismiss, a court must accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).  The facts alleged in the complaint must state merely a plausible claim for relief to survive a motion to dismiss—nothing more.  *Collins v. Fulton Cty. Sch. Dist.*, No. 1:12-CV-1299, 2012 WL 7802745, at *5 (Dec. 26, 2012) (citing *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007)); *see also Twombly*, 550 U.S. at 556 (noting that the pleading standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claim). As set forth below, Plaintiffs have amply satisfied this standard, and each of Defendants' arguments to the contrary are unavailing. Accordingly, Plaintiffs respectfully request that the Court deny the Motions.

## I. PLAINTIFFS' THIRD AMENDED COMPLAINT INCLUDES SPECIFIC ALLEGATIONS CONCERNING STANDING AND REMEDY AS DIRECTED BY THE COURT

As the Court directed in its April 19, 2017 Order, paragraphs 16 through 26 of the Third Amended Complaint describe the grounds on which the organizational and individual Plaintiffs have standing. (Doc. 76, pp. 1-2.) Specifically, these paragraphs identify the current Board of Commission ("BOC") and Board of Education ("BOE") districts in which Plaintiffs reside, the districts in which the individual representative members of the Georgia NAACP and GALEO live, the districts in which dilution has occurred, the individual Plaintiffs who reside in packed Board of Education District 5, and the nature of the harm suffered by Plaintiffs. (Doc. 76, p. 2.) These allegations provide all of the information directed by the Court, and they far exceed the normal threshold for any voting rights case, including coalition cases brought under Section 2.

For example, the Third Amended Complaint alleges that both the Georgia NAACP and GALEO have members who reside in all of the existing Board of Commissioner and Board of Education districts, including many members who reside in areas where both remedial BOC and BOE districts could be drawn. (Doc. 160, ¶¶ 16-17.) The mission of the Georgia NAACP is "to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons." (*Id.* at ¶ 16) (emphasis added). Finally, both organizations have members of more than one applicable racial or language minority group. (*Id.* at ¶¶ 16-17.) While the allegations with respect to the individual Plaintiffs are discussed in more detail below, see Section II(2), *infra*, each Plaintiff alleges he or she has been denied an equal opportunity to participate in local elections based on his or her current BOC and BOE district (in addition to the at-large Commission Chair position). (*Id.* ¶¶ 18-26.)

With respect to remedy, Plaintiffs have pled in the alternative pursuant to Fed. R. Civ. P. 8(a) and in deference to the Court's authority and discretion to determine the ultimate remedy in a Section 2 case. Moreover, Plaintiffs have pled with specificity concerning their proposed remedies. (*Id.* ¶¶ 9, 16-26, 60-61, 69, 82-87, 125-126, Prayer for Relief, ¶¶ (e) and (f).) These paragraphs identify the method of electing the Board of Commissioners and Board of Education members, the geographic locations of potential remedial districts, the racial and language

minority groups that could satisfy the first *Gingles* precondition, and the individual

Plaintiffs who could live within them.  (Doc. 160, ¶¶ 16-26, 125-126, Prayer for

Relief, ¶¶ (e) and (f).)  The Third Amended Complaint neither seeks to change the

Board of Commissioners' form of government, nor asserts that the proffered

remedial districts are the only method of remedying the Section 2 violation.  (*Id.* at

Prayer for Relief, ¶ (h).)

## II.   PLAINTIFFS HAVE STANDING

### 1.   <u>The Legal Standard for Standing in Vote Dilution Cases</u>

When a defendant makes a facial attack on subject matter jurisdiction under

Federal Rule 12(b)(1) and submits no evidence outside the pleadings, the Court

looks to whether the plaintiff has "sufficiently alleged a basis of subject matter

jurisdiction, and the allegations in the complaint are taken as true for the purposes

of the motion."  *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990);

*see also Harris v. City of Zion*, 927 F.2d 1401, 1406 (7th Cir. 1991) ("[t]he test for

standing, as for jurisdiction generally, is what the complaint alleges, not what the

evidence shows.").

Under the Voting Rights Act, any "aggrieved person" may institute a

proceeding to enforce the right to vote.  52 U.S.C. § 10302.  To establish standing,

a plaintiff must show a "concrete and particularized" injury to a legally protected

interest; a causal connection between that injury and conduct "fairly traceable" to

the defendant; and that the injury is likely to be remedied by a favorable decision to the plaintiff. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). For decades, the inquiry into whether a vote dilution plaintiff has suffered a particularized injury has focused on (1) whether the voter lacks an equal opportunity to elect candidates of choice due to his or her residency, and (2) whether that injury is curable by the creation of a properly-drawn single-member district. *Compare Whitcomb v. Chavis*, 403 U.S. 124, 137 n.17 (1971) (residents of the multimember district lacked standing because they did not live in the "Center Township ghetto"), *with Baker v. Carr*, 369 U.S. 186, 204 (1962). Specifically, in a Section 2 case, the putative injury is that the minority lacks "substantial proportionality" of political opportunity—per capita voting power on par with the majority—under the existing voting system.[1] *Johnson v. DeGrandy*, 512 U.S. 997, 1013-15 (1994).

The first *Gingles* precondition, which requires that the minority population be sufficiently large and geographically compact to form a majority in a single-member district, provides guidance concerning whether a Section 2 plaintiff has standing. *Thornburg v. Gingles*, 478 U.S. 30, 50 n.16 (1986); *Pope v. Cty. of Albany*, No. 1:11-cv-0736, 2014 WL 316703, at *5 (N.D.N.Y. Jan. 28, 2014); *see also Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 731 n.14 (N.D. Tex. 2009)

---

[1] This concept is distinct from proportional representation, which is not guaranteed by Section 2. *DeGrandy*, 512 U.S. at 1014 n.11.

5

(citing *Salas v. Sw. Texas Junior Coll. Dist.*, 964 F.2d 1542, 1554 (5th Cir. 1992) (the *Gingles* analysis, as a whole, "is an inquiry into causation—whether the given electoral practice is responsible for plaintiffs' inability to elect their preferred representatives")). The standing inquiry is closely connected with the *Gingles* analysis because it "requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *DeGrandy*, 512 U.S. at 1008.

Accordingly, a Section 2 plaintiff has standing if he or she resides in an area that could support a remedial majority-minority district. *Pope*, 2014 WL 316703, at *5 (holding that "supported allegations that plaintiffs reside in a reasonably compact area that could support additional MMDs [majority-minority districts] sufficiently proves standing for a Section 2 claim for vote dilution" for African-American and Latino voters); *see Barnett v. City of Chicago*, 1996 WL 34432, at *4-5 (N.D. Ill. Jan. 29, 1996) (African-American and Latino voters have suffered an individualized injury-in-fact because "at least one of their class members lives in a majority-white ward that could be redrawn" into a majority-minority ward, while others live in packed wards that could similarly be redrawn).

This is true of plaintiffs who currently live in single-member districts that dilute minority voting strength by "cracking" minority population centers, as well as districts that dilute minority voting strength by "packing" minority population

centers. *Gingles*, 478 U.S. at 46 n.11 (1986) (vote dilution "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority"); *Broward Citizens for Fair Districts v. Broward Cty.*, No. 12-601317-CIV, 2012 WL 1110053, at *3 (S.D. Fla. Apr. 3, 2012) (Smith may have standing to bring packing claim in District 9 because he and other minority voters were allegedly moved there from a nearby district); *see also Barnett*, 1996 WL 34432, at *5.

In the Eleventh Circuit, individuals have suffered personal injury for purposes of a Section 2 case if they are minority registered voters who "reside in the area directly affected by the allegedly illegal voting scheme"–meaning that they "are residents of the area governed by the challenged illegal election scheme and their voting powers plainly are affected by that scheme." *Wilson v. Minor*, 220 F.3d 1297, 1303 n.11 (11th Cir. 2000), *abrogated on other grounds by Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324 (11th Cir. 2007); *see also Dillard v. Baldwin Cty. Comm'rs*, 225 F.3d 1271, 1279-80 (11th Cir. 2000), *abrogated on other grounds by Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324 (11th Cir. 2007); *Broward Citizens for Fair Districts*, 2012 WL 1110053, at *3. While the Eleventh Circuit has frequently considered standing in the context of challenges to at-large election schemes, *see, e.g.*, *Meek v. Metro. Dade Cty., Fla.*, 985 F.2d 1471, 1480

(11th Cir. 1993); *Solomon v. Liberty Cty., Fla.*, 899 F.2d 1012, 1013-14 (11th Cir. 1990), it has not yet done so in the context of a single-member district method of election.

### 2. The Individual Plaintiffs Have Standing

The individual Plaintiffs, each of whom is a member of a minority group and a registered voter in Gwinnett County, have adequately demonstrated their standing in the Third Amended Complaint by alleging facts that show they have suffered a personalized harm.[2]  (Doc. 160, ¶¶ 18-26.)  In compliance with the Court's Order, the Third Amended Complaint identifies the current Board of Commissioners districts and Board of Education districts in which the Plaintiffs reside, and the nature of the harm suffered as a result of packing certain Plaintiffs in Board of Education District 5.  (*Id.*)

Each Plaintiff resides in an area in Gwinnett County where a single-member district can be drawn containing a sufficient number of Black, Latino, and/or Asian-American voting age citizens to constitute a majority-minority population. (*Id.*)  No Plaintiff is able to elect a candidate of choice to the Board of

---

[2] Even though each plaintiff has standing to bring all of the asserted claims here, a plaintiff is not required to make such a showing at the pleading stage. This is because, as the Eleventh Circuit has held, if a court finds that even one of the named plaintiffs has standing to pursue all of the asserted claims, it need not inquire as to whether the other plaintiffs also have standing for those plaintiffs to remain in the suit.  *Public Citizen, Inc. v. Miller*, 992 F.2d 1548 (11th Cir. 1993); *accord Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977).

Commissioners within his or her district or to the at-large Chair position, and seven Plaintiffs also lack the ability to elect a candidate of choice to the Board of Education. The remaining two Plaintiffs allege they are "packed into a BOE district where [their votes are] of lesser value because Black, Latino, and Asian-American voters are over-concentrated there." (*Id.* ¶¶ 18, 23.) These allegations must be accepted as true and construed in favor of the complaining party. *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 109 (1978).

The import of these allegations is clear: the Board of Education scheme packed minority voters in BOE District 5, which—combined with the alleged dilution of minority population centers in the I-85 corridor and greater Lawrenceville and Snellville areas by Districts 1 through 4—precluded the drawing of a second majority-minority district. With respect to the Board of Commissioners, the creation of any majority-minority districts was prevented by the combination of the at-large Chair position and the dilution of every minority population center in Gwinnett County by Districts 1 through 4.

Because Plaintiffs (1) have been harmed as a consequence of their placement in their current Board of Commissioners and Board of Education districts, and (2) their injuries can be cured because they live in an area that can be included within properly-drawn remedial BOC and BOE districts (thus satisfying the first *Gingles* precondition), the allegedly illegal voting scheme directly affects their voting

power and they have standing to challenge both redistricting plans under Section 2. *Wilson*, 220 F.3d at 1303 n.11. This satisfies the Section 2 standard for challenges to at-large positions and single-member districting schemes.

### 3. Multiple Single-Member Districts Can Dilute a Single Minority Population Center

The School District Defendants assert that Plaintiffs cannot state a vote dilution claim with respect to BOE Districts 1 through 4 because a Section 2 claim "may only be maintained against a district in which a plaintiff can satisfy the three [*Gingles*] preconditions." (Doc. 171, at 12.)[3] This suggested standard, found nowhere in the case law, makes no sense. Indeed, "cracking" claims frequently implicate several districts, and a voter living in any of the fractured districts is necessarily injured and has standing herself.

In *Thornburg v. Gingles*, the Supreme Court recognized that Section 2 may be violated if a "minority group that is sufficiently large and compact to constitute

---

[3] Defendants' argument that asserting dilution in additional districts drives up expert costs is not only irrelevant but also a red herring. In the Eleventh Circuit, all endogenous elections are probative of local voting patterns. *See, e.g.*, *Johnson v. Hamrick*, 196 F.3d 1216, 1222 (11th Cir. 1999); *Askew v. City of Rome*, 127 F.3d 1355, 1381 n.13 (11th Cir. 1997). In this case, endogenous elections include all elections for positions on the Gwinnett County Board of Commissioners and Board of Education, regardless of district. *Georgia State Conf. of the NAACP v. Fayette Cty. Bd. of Com'rs*, 950 F. Supp. 2d 1294, 1320 (N.D. Ga. 2013), *rev'd on other grounds*, 775 F.3d 1336 (11th Cir. 2015); *Rios-Andino v. Orange Cty.*, 51 F. Supp. 3d 1215, 1226 (M.D. Fla. 2014). As a result, the universe of endogenous elections will be the same no matter how many existing districts are allegedly dilutive.

a single-member district has been split between **two or more… single-member districts, with the effect of diluting the potential strength of the minority vote**." 478 U.S. 30, 50 n.16 (1986) (emphasis added). This proposition is logical because submerging a minority population by dividing it between single-member districts necessarily requires two or more "dilutive" districts. *See also DeGrandy*, 512 U.S. at 1015 ("where a State has split (or lumped) minority neighborhoods that would have been grouped into a single district (or spread among several) . . . [that] treatment might be significant evidence of a § 2 violation").

Not surprisingly, courts have regularly adjudicated Section 2 claims involving the alleged use of two or more districts to dilute the voting strength of a single minority population center. *See, e.g.*, *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 767 n.1, 769 (9th Cir. 1990) (affirming the district court's finding that Los Angeles County "intentionally fragmented the Hispanic population among the various districts"); *Perez v. Abbott*, 250 F. Supp. 3d 123, 168 (W.D. Tex. 2017) (adjudicating claim that "in northeast Dallas County, significant minority concentration is cracked among five Anglo-dominated districts (107, 112, 102, 113, and 114)"); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 376-77, 381-82 (S.D.N.Y. 2004) (adjudicating claim that Senate Districts 3, 4, and 6 dilute Suffolk County's black and Latino population, and Senate Districts 6, 7, 8, and 9 dilute the black population of Nassau County, where one remedial district can be created).

**4. <u>Plaintiffs Do Not Need to Live in Each Dilutive District to Have Standing</u>**

Because vote dilution can occur in myriad ways, there is no pleading requirement that at least one vote dilution plaintiff must reside in each dilutive district to have standing or, with respect to a coalition claim, that a plaintiff from each affected racial or language minority group reside in each dilutive district. Defendants' argument to the contrary has no basis in law. In fact, there is a long history of courts adjudicating vote dilution cases in which plaintiffs did not reside in at least one of the allegedly dilutive districts. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 204, 207-08 (1962) (residents of five counties had standing to challenge the statewide apportionment of state legislative districts among the 95 counties in Tennessee); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 376-77, 381-82 (S.D.N.Y. 2004), and No. 02 Civ. 618 (RMB), ECF No. 26, First Amended Complaint (S.D.N.Y. Apr. 25, 2003) (court considers merits of black-Latino Section 2 coalition claim even though there was no plaintiff in Senate District 9, no African-American plaintiff in Senate District 3, and no Latino plaintiff in Senate District 4); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, No. 03-CV-502, 2003 WL 21524820, at *3-4 (N.D.N.Y. July 3, 2003) (black-Latino Section 2 coalition claim can proceed because one African-American voter has standing); *Anderson v. Mallamad*, No. IP-94-1447, 1997 WL 35024766, at *4 (S.D. Ind. Mar. 28, 1997) (two plaintiffs had standing to bring Section 2 claim

against the practice of electing small claims court judges in Marion County by township district, even though they resided in only one of the nine townships).

### 5. Defendants Failed to Establish that the Voter-Plaintiffs Do Not Have Standing as a Matter of Law

Defendants argue that Plaintiffs lack standing under *United States v. Hays*, 515 U.S. 737 (1995); *Wright v. Dougherty Cty., Ga.*, 358 F.3d 1352 (11th Cir. 2004); and *Broward Citizens for Fair Districts v. Broward Cty.*, No. 12-601317-CIV, 2012 WL 1110053 (S.D. Fla. Apr. 3, 2012). (Docs. 49-1, at 21-22; 52-1, at 9; 89-1, at 13-14; 93-1, at 13; 170-1, at 13-15; 171, at 9-10.) These cases are unavailing, however, because the respective plaintiffs failed to allege that they had suffered any harm. Here, in contrast, Plaintiffs allege that they have suffered harm on account of the drawing of district lines in a compact area where they reside. (Doc. 160, ¶¶ 18-26) (each plaintiff is being denied an equal opportunity to elect in his or her current Board of Education and Board of Commissioners district). Additionally, under established Eleventh Circuit law, all of the Plaintiffs have standing to challenge the at-large Chair of the Board of Commissioners. *Wilson*, 220 F.3d at 1303 n.11.

In *Broward Citizens*, plaintiff Smith lived in District 9, but alleged harm caused to residents in other districts. 2012 WL 1110053, at *3. In *Wright*, not only were the plaintiffs not harmed by the challenged malapportionment plan, they had benefitted under it because they were overrepresented compared to residents of

13

other districts.  358 F.3d at 1355.  Finally, the plaintiffs in *Hays* lived in

Louisiana's Fifth Congressional District, but were challenging the Fourth District.

515 U.S. at 750 (Breyer, J., concurring) (Plaintiffs are "voters . . . who do not

reside within the district they challenge"); *Pope*, 2014 WL 316703, at *6

(N.D.N.Y. Jan. 28, 2014) ("Plaintiffs here, in addition to making their claim under

Section 2 as opposed to the Fourteenth Amendment, challenge the drawing of

district lines in a compact area within the City of Albany, where they reside.").

 *Hays* involved a challenge to the use of racial classifications with respect to

a single Congressional district on equal protection grounds.  515 U.S. at 744-46;

*see also Wilson*, 220 F.3d at 1303 n.11 (rejecting the argument "that because the

Plaintiffs allege only that they are residents of Dallas County, rather than of a

particular racially gerrymandered district, they have not satisfied the requirements

of standing" under *Hays*).  Trying to graft "*Hays'* narrow holding regarding

standing in the gerrymandering context," *Wilson*, 220 F.3d at 1303 n.11, onto this

case diverts attention from the core issue in the Section 2 standing inquiry:

"whether or not black and Hispanic voters allege that they do not enjoy

proportional political opportunity."  *Pope*, 2014 WL 316703, at *6; *see also*

*DeGrandy*, 512 U.S. at 1015-16.

 The School District Defendants' additional argument that District 5

Plaintiffs are somehow not harmed by the current Board of Education plan is

similarly unavailing.  The Board of Education's current districting plan packs

Black, Latino and Asian-American residents into District 5, where they together

constitute approximately 74.4% of the citizen voting age population (while 23.6%

of the citizen voting age population in District 5 is white).  By contrast, Black,

Latino and Asian-American voters do not combine to form more than 40.5 percent

of the citizen voting age population in any of the four other Board of Education

districts.

The Supreme Court has consistently recognized that packing minorities into

a district is a legally cognizable harm under Section 2.  In *Johnson v. De Grandy*,

the Supreme Court affirmed its conclusion in *Voinovich v. Quilter* that

manipulation of district lines can dilute the voting strength of a politically cohesive

group of minority voters by either "fragmenting the minority voters among several

districts where a bloc-voting majority can routinely outvote them, or by packing

them into one or a small number of districts to minimize their influence in the

districts next door."  512 U.S. 997, 1007 (1994); *see also Voinovich v. Quilter*, 507

U.S. 146, 153-54 (1993).  Section 2 prohibits line drawing that "impairs the ability

of a protected class to elect its candidate of choice on an equal basis with other

voters."  *Voinovich*, 507 U.S. at 153 (quoting *Thornburg v. Gingles*, 478 U.S. 30,

47 (1986)).  Plaintiffs residing in District 5 were packed into a district over-

concentrated with Black, Latino, and Asian-American voters.  On account of this

packing, their votes carry lesser value than those of other Board of Education voters, and therefore they have standing.

These facts—and the supporting precedent from the Supreme Court—render the *Wright* case wholly inapplicable to the standing of District 5 Plaintiffs, for a host of reasons. First, *Wright* is an equal protection "one person one vote" case, not a Section 2 case. Second, as noted above, the Eleventh Circuit found that the plaintiffs did not have standing because they were in an ***over***represented district and were suing on behalf of those in the ***under***represented district. 358 F.3d at 1355. Therefore, not only were the plaintiffs not harmed, their proposed remedy would have reduced their own voting strength. Here, in contrast, District 5 Plaintiffs are harmed by being packed into a district that is over-concentrated with minority voters, and under their proposed remedial district remedy, they will continue to have the ability to elect their candidate of choice. District 5 Plaintiffs' power to elect the candidate of their choice will not be lessened; rather, they will have an opportunity to elect the candidate of their choice in a Board of Education district that is not over-concentrated.

### 6. <u>Organizational Plaintiffs Have Standing</u>

Defendants continue to argue that the Georgia NAACP and GALEO do not have standing "because they do not represent the interests of all three minority groups." (Docs. 171, at 15-16; 170-1, at 12-13; 89-1, at 11; 93-1, at 11-13; 49-1, at

22-24.)  But Defendants' briefs do not cite any precedent supporting the arbitrary and unworkable requirement that an organizational plaintiff must equally represent the interests of every racial minority group participating in this litigation.  This argument must fail for the reasons set forth below, as well as those articulated in Plaintiffs' Brief in Opposition to Dismiss.  (Doc. 60, pp. 13-17.)

First, the Georgia NAACP and GALEO satisfy the first prong of the test in *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977), because their individual members would otherwise have standing to sue in their own right. Second, increasing opportunities for minority voters to have a meaningful voice in Gwinnett County elections, and challenging redistricting plans that dilute Black and Latino voting strength, are germane to the stated goals and purposes of both entities.[4]  (Doc. 160 ¶ 16-17.)  Third, even if the strict organizational standing requirement offered by the Defendants existed, the Complaint sufficiently describes both the Georgia NAACP's and GALEO's inter-racial and inter-community missions.  (Doc. 160 ¶¶ 16-17.)  Finally, both organizations have members from multiple minority groups, as evidenced by the fact that Asian-American Plaintiff Sheikh Rahman is a member of the Georgia NAACP and Afro-Latina Plaintiff Victoria Arzu is a member of GALEO.

---

[4] One of the Georgia NAACP's principal aims is to "eliminate racial discrimination" for all minority groups.

There is ample precedent for organizations such as GALEO or the Georgia NAACP to serve as organizational plaintiffs in Section 2 coalition cases. *See, e.g.*, *Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*, 906 F.2d 524, 525 (11th Cir. 1990) (including the Hardee County NAACP as a plaintiff); *see also Bridgeport Coal. For Fair Representation v. City of Bridgeport*, 26 F.3d 271 (2d Cir. 1994), *vacated on other grounds*, 512 U.S. 1283 (1994) (plaintiffs include the NAACP, Greater Bridgeport Branch of the NAACP, Puerto Rican Coalition, and Connecticut Latino Redistricting Committee); *LULAC v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1495 n.2 (5th Cir. 1987) (plaintiffs include the League of United Latin American Citizens, the Mexican American Legal Defense and Education Fund, and the Black Advisory Council). The Court should therefore deny Defendants' motion to dismiss as to the organizational Plaintiffs.

## III. PLAINTIFFS' PROPOSED REMEDIES ARE VIABLE

### 1. <u>Plaintiffs Do Not Need to Produce a Remedial Map at this Stage</u>

Defendants argue that the Third Amended Complaint fails to propose a viable remedy because it describes "hypothetical remedial districts . . . in geographical terms rather than attaching the map showing their exact location." (Doc. 171, at 12.) The cases they cite, however, do not support this proposition.[5]

---

[5] Defendants cite *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998); *S. Christian Leadership Conf. v. Sessions*, 56 F.3d 1281 (11th Cir. 1995) (en banc); and *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994). (Docs. 170-1, at 16; 89-1, at 6; 93-1, at

Section 2 plaintiffs are not required to produce a single unobjectionable alternative map with their complaint. *Luna v. County of Kern*, No. 1:16-cv-568, 2016 WL 4679723, at *4-5 (E.D. Cal. Sept. 6, 2016).[6] In fact, Plaintiffs may offer multiple remedial plans or proposals at trial, so long as they comply with Section 2. *United States v. Osceola Cty., Fla.*, 475 F. Supp. 2d 1220, 1230 (M.D. Fla. 2006) (noting the expert presented "several plans" at trial, "suggest[ing] that the first *Gingles* factor has been met"). This principle would be frustrated if Plaintiffs were required to plead an alternative map with exacting precision in the complaint.

Instituting a map requirement at the outset would inevitably lead to parties asking the Court to prematurely weigh disputed issues of material fact and to premature clashes involving statistical and other factual expert analysis. *Luna*, 2016 WL 4679723, at *5; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[a]sking for plausible grounds [for relief] . . . simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of

---

16.) These cases are inapposite because the remedy problems in these cases were unique to the election of state trial court judges. These cases also arrived at the Eleventh Circuit after bench trials, instead of before discovery had taken place. *Chiles*, 139 F.3d at 1418-19; *Sessions*, 56 F.3d at 1283; *Nipper*, 39 F.3d at 1497.
[6] The *Luna* Court pointed out that the district court in *Broward Citizens* made a mistake in observing that the plaintiffs' failure to present a proposed map "represents an additional pleading deficiency" because "that court extended what is an evidentiary requirement for purposes of summary judgment to the pleading stage of litigation." *Id.* at *4 (*quoting Broward Citizens*, 2012 WL 1110053, at *5 n.6 (S.D. Fla. Apr. 3, 2012), and *citing Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999)).

[liability].") When assessing defendants' criticisms of the alternative map, the Court would be drawn beyond reviewing the complaint for "facial plausibility . . . allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and invited to prematurely make credibility determinations. *See, e.g.*, *Wright v. Sumter Cty. Bd. of Elecs. and Registration*, 657 Fed. App'x 871, 872 (11th Cir. 2016) (district court improperly resolved a dispute of material fact and discounted an expert's calculations at the summary judgment stage); *Bonilla v. Chicago*, 809 F. Supp. 590, 595-96 (N.D. Ill. 1992) (denying defendants' motion to dismiss while noting they may ultimately succeed in establishing that plaintiffs inappropriately seek to maximize Hispanic voting strength); *Hall v. Louisiana*, 974 F. Supp. 2d 978, 992 (M.D. La. 2013) (denying a motion to dismiss a § 2 claim in light of similarly pled facts).

### 2.  Plaintiffs Do Not Need to Devise the Final Remedy at this Stage

Defendants assert that the proposed remedies in the Third Amended Complaint are not viable because they are "inconsistent," with respect to both the number and description of the proposed remedial districts.  (Docs. 171, at 11; 170-1, at 7; 89-1, at 93-1, at 7-8.)  At this stage of the litigation, however, Plaintiffs need only plead facts that plausibly "establish that the minority has the **potential** to elect a representative of its own choice from some single-member district." *Nipper*

*v. Smith*, 39 F.3d 1494, 1530–31 (11th Cir. 1994) (en banc) (emphasis added). The burden of demonstrating that potential, even at trial, is less than what is required when devising the final remedial plan. *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 671 (5th Cir. 2009) (observing that "the plaintiffs' plan need not be an ultimate solution"); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1399 (E.D. Wash. 2014) ("the first *Gingles* precondition does not require . . . proof that a perfectly harmonized districting plan can be created.").

Fundamentally, Defendants' argument ignores the fact that Plaintiffs have pled in the alternative, in deference to the considerable discretion afforded to a legislature or local government in the first instance, and the Court in the second, in fashioning a remedy. A jurisdiction has the first opportunity to remedy a Section 2 violation, and only if it fails to do so may the court fashion a remedial plan. *White v. Weiser*, 412 U.S. 783, 794 (1973); *Upham v. Seamon*, 456 U.S. 37, 40-42 (1982). Ultimately, the court need not necessarily order the enactment of a single-member district plan at all. *See, e.g.*, *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 453 (S.D.N.Y. 2010) (ordering the use of an at-large "cumulative voting" system); *United States v. Euclid City School Bd.*, 632 F. Supp. 2d 740, 770 (N.D. Ohio 2008) (at-large "limited voting" proposal complies with Section 2). Defendants' proposed pleading requirement would impinge on the substantial authority of the Court to fashion appropriate relief upon a finding of vote dilution.

### 3. **The Minimum Change Rule Does Not Apply at this Stage, but Plaintiffs' Proposed Remedies Comply Nonetheless**

Defendants argue that Plaintiffs' remedial districts are not "in keeping with the requirement that a court imposing a remedial plan must be a 'minimum change' plan." (Doc. 171, at 14 (citing *Upham v. Seamon*, 456 U.S. 37 (1982)).) This argument puts the cart before the horse. The minimum change doctrine applies to court-ordered plans implemented to remedy a constitutional or Voting Rights Act violation, not a preliminary plan offered by plaintiffs to show that the first *Gingles* precondition can be satisfied (let alone a district suggested by pleadings in a complaint). *Compare Upham*, 456 U.S. at 43-44, *with Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 671 (5th Cir. 2009); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1399 (E.D. Wash. 2014).

Defendants also misconstrue the "minimum change" rule. *Upham* itself sanctions all modifications "necessary to cure any constitutional or statutory defect." 456 U.S. at 43; *see also White v. Weiser*, 412 U.S. 783, 796 (the "District Court should not, in the name of state policy, refrain from providing remedies fully adequate to redress constitutional violations which have been adjudicated and must be rectified."). The Supreme Court has held that a district court was justified in reconfiguring "almost every district" in a Georgia statewide congressional plan, so long as the changes were "consistent with Georgia's traditional districting principles." *Abrams v. Johnson*, 521 U.S. 74, 86 (1997). Courts regularly balance

the need to remedy an illegal plan with the state's legislative prerogative and traditional districting principles. *See, e.g.*, *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1358-59 (N.D. Ga. 2014); *Smith v. Cobb Cty. Bd. of Elecs. and Registrations*, 314 F. Supp. 2d 1274, 1293 (N.D. Ga. 2002). It is premature to consider how that balance should be struck, and any dispute regarding this issue should be reserved for the appropriate time.

### 4. Plaintiffs' Proposed Remedies Do Not Change the Board of Commissioners' Form of Government

Finally, the Board of Commissioners persists in arguing that the Third Amended Complaint seeks to change the Commission's form of government. (Docs. 170-1, at 17-19; 93-1, at 17-18; 52-1, at 19-21.) Plaintiffs' proposed remedies employ the same form of government that is currently in effect: five commissioners, one of whom serves as the Chair. (Doc. 160 ¶¶ 9, 61, 125.) The "4-1" remedy will continue the current system where four commissioners are elected from districts and the Chair is elected at large. (*Id.* ¶¶ 60, 126.)[7] For all the reasons articulated in Plaintiffs' Brief in Opposition to Dismiss (Doc. 60, at 25-29), the "5-0" remedy is also permissible under Section 2 case law in the Eleventh

---

[7] This is the third time County Defendants have sought to dismiss this action based on a strained reading of (revised) Paragraph 126 of the Second Amended Complaint without previously approaching Plaintiffs regarding the possibility of amending the purportedly infirm language.

Circuit.  *Wilson*, 220 F.3d at 1307-09; *Dillard v. Crenshaw Cty., Ala.*, 831 F.2d 246, 247-53 (11th Cir. 1987).

## CONCLUSION

Defendants' Motions to Dismiss should be denied in their entirety for the reasons articulated above.  In the event the Court grants any part of either Motion, Plaintiffs respectfully request leave to modify the Third Amended Complaint accordingly.

Dated: November 15, 2017        Respectfully submitted,

By: */s/ Brian J. Sutherland*
    Brian J. Sutherland
    Georgia Bar 105408
    Edward D. Buckley
    Georgia Bar 092750
    Buckley Beal, LLP
    1230 Peachtree Street, N.E., Suite #900
    Atlanta, GA 30309
    Telephone:  (404) 781-1100
    Facsimile:   (404) 781-1101

    */s/ John Powers*
    Ezra D. Rosenberg, Esq.*
    Julie Houk, Esq.*
    John Powers, Esq.*
    erosenberg@lawyerscommittee.org
    jhouk@lawyerscommittee.org
    jpowers@lawyerscommittee.org
    Lawyers' Committee for Civil Rights Under Law
    1401 New York Ave., NW, Suite 400
    Washington, D.C. 20005
    Telephone:  (202) 662-8600
    Facsimile:   (202) 783-0857

April N. Ross, Esq.*
Clifford J. Zatz, Esq.*
aross@crowell.com
czatz@crowell.com
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Telephone:   (202) 624-2500
Facsimile:    (202) 628-5116

*Admitted pro hac vice

Counsel for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GEORGIA STATE CONFERENCE OF
THE NAACP, as an organization; et al.,

      Plaintiffs,

v.

GWINNETT COUNTY BOARD OF
COMMISSIONERS; et al.,

      Defendants.

Civil Action No.
1:16-cv-02852-AT

## CERTIFICATE OF SERVICE AND
## COMPLIANCE WITH LOCAL RULE 5.1(C)

I hereby certify that on this 15th day of November, 2017, the foregoing

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO**

**DISMISS** was filed electronically with the Clerk of Court using the CM/ECF

system, which will automatically send e-mail notification of such filing to all

attorneys of record, including:

    A. Lee Parks
    Andrew Y. Coffman
    Anne W. Lewis
    Barcley Hendrix
    Brian R. Dempsey
    E.L. Victoria Sweeny
    Frank B. Strickland
    Wesley C. Lancaster
    Richard A. Carothers

I further certify that the foregoing has been prepared in a Times New Roman 14 point font, which is one of the font and point selections approved by the Court in Local Rule 5.1(C).

By:    */s/ Brian J. Sutherland*

Brian J. Sutherland
Georgia Bar 105408
Edward D. Buckley
Georgia Bar 092750
Buckley Beal, LLP
1230 Peachtree Street, N.E., Suite #900
Atlanta, GA 30309
Telephone:   (404) 781-1100
Facsimile:    (404) 781-1101

*Counsel for Plaintiffs*