IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; et al., <br><br> Plaintiffs, <br><br> v. <br><br> GWINNETT COUNTY BOARD OF REGISTRATIONS AND ELECTIONS; et al., <br><br> Defendants. | Civil Action No. <br> 1:16-cv-02852-AT |

REBUTTAL DECLARATION

RICHARD L. ENGSTROM

RICHARD L. ENGSTROM, acting in accordance with 28 U.S.C. § 1746, Fed. R. Civ. P. 26(a)(2)(B), and Fed. R. Evid. 702 and 703, does hereby declare and say:

1.  My name is Richard L. Engstrom and I am a resident of Chapel Hill, North Carolina. I previously submitted a Declaration in this case dated August 8, 2017, and a Supplemental Report dated January 22, 2018.

2.  The expert witness for the Defendants in this case, Dr. John Alford, notes in his Second Supplemental Expert Report that I relied on Zelig software developed by Dr. Gary King to derive my estimates of the levels of voting support for candidates by the different groups in

1

Gwinnett County. Dr. Alford is correct about that, but his statement that the version of the Zelig software I used "is no longer available" (at 3, n. 2) is incorrect. It can be accessed, through R, at [http://r.iq.harvard.edu/archived/src/contrib/zelig_3.5.4 tar.gz](http://r.iq.harvard.edu/archived/src/contrib/zelig_3.5.4.tar.gz). The version I used for the analyses in this case is Zelig 3.5, released on November 8, 2011. He further states that there are "more recent versions" of that software, although I am aware of only one that Dr. King played a role in developing, which is Package 'Zelig,' which was published on November 12, 2017, subsequent to my analysis for this case.

3. I am confident that the estimates of the candidate preferences that I have derived through King's EI routine and report below are close to the actual candidate preferences of the voters in Gwinnett County, as verification studies have shown the procedure to do a good job of estimating "true values" of interest, and has done so since the earliest version of it.

4. Despite the difference in the software we use to derive our estimates, the estimates that Dr. Alford reports for both white support and African American support for the various candidates, and those that I report, do not materially differ, as has been the case before.

5. When it comes to the candidate preferences of Latino voters and Asian American voters, there are often some sizable differences in our estimates, both in the point estimates and the confidence intervals. In his Second Supplemental Report Alford focuses on the confidence intervals. He opines that the 95-percent confidence intervals I report for the point estimates of the support that Latino and Asian American voters have provided to the minority candidates "understate the uncertainty" in these estimates (at 4). He points to "the characteristics of the available data" as a reason for this, particularly "the relatively small number of precincts combined with the limited variation in the proportion of minority voters across precincts" (at 4). He writes

that "Data of this character *generally* does not support narrow error estimates" (at 4, emphasis added).

6.     But the number of precincts and variation in the relative presence of a group's voters within them are not the only factors that influence the size of a confidence interval for an estimate. Another important factor is the pattern of group support across precincts, and how consistent they are. In a multivariate analysis, which Dr. Alford and I perform, estimation occurs simultaneously among the groups and the estimation for each group has an impact on the estimates for the other groups.

7.     Dr. Alford opines in his Second Supplemental Report that the differences in our estimates are the result of us using different software to implement EI, in conjunction with the "particulars of the data available" (at 4). He refers to "the relatively small number of precincts" in which votes are cast in the elections analyzed, and "the limited variation in the proportion of minority voters across [these] precincts" (at 4). But these "particulars" are themselves largely limited to Dr. Alford's analyses of district-based elections. In at-large (countywide) elections, in which all of the voters in Gwinnett County may participate, there are more voting precincts and greater variation in the proportion of voters than in district-level contests. These at-large elections are generally more probative of racially polarized voting than the smaller district elections, which Dr. Alford acknowledges.[1]

---

[1] In his deposition in this case, Dr. Alford was asked:
> Q   And in your opinion, are Commission chair elections particularly
> probative because they're being conducted at- large and therefore contain
> all of Gwinnett County's voters?
> A   Yes, I think they're -- because they cover the entire county,
> They probably should be given some greater weight than a single
> Individual district race (Deposition, at 193-194).

8.     The single most probative election among all those analyzed in this case is the at-large election for the Chair position on the Gwinnett County Commission held in November of 2016. It is the most recent endogenous at-large election studied by the both Dr. Alford and myself. The voters in the county voted in 156 precincts in this at-large election, which is not a small number of precincts. There were also precincts in which a majority of the voters turning out to vote was White or African American. There were no precincts in which Latinos or Asian Americans constituted a majority of the voters, but there were precincts in the county in which these groups constituted over twenty percent of the voters turning out. While it would be preferable, for analytic purposes, to have larger proportions of Latinos or Asian Americans among those receiving ballots in some precincts, these data were sufficient for both Dr. Alford and I to derive similar point estimates for Latino and Asian American voter support for Mr. Shealey, the African American candidate in that election. Both estimates were also the subject of fairly narrow confidence intervals.

9.     Dr. Alford's point estimate for Mr. Shealey's Latino vote is 92.3 percent, with a confidence interval ranging from 85.7 to 96.6 percent. Likewise Dr. Alford's point estimate of the Asian American support for Mr. Shealey is 85.1 percent, with a confidence interval ranging from 70.6 to 93.5 percent.

## Exogenous Elections

10.    Much can be learned about the candidate preferences of Latino and Asian voters in Gwinnett County by examining the vote in the county in exogenous elections in which all voters may cast ballots. There are exogenous elections that are particularly appropriate for this purpose. They are partisan elections, as are the endogenous County Commission and Board of Education elections. They occur at the same time as Commission and Board of Education elections. Indeed,

they appear on the same November general election ballots in even numbered years as the Commission and Board of Education contests that Dr. Alford and I previously analyzed. They voters in the endogenous elections overlap with those in the exogenous elections.

11.     There has been only one exogenous election, to my knowledge, in recent years in which voters in Gwinnett County were presented with a choice between or among a minority candidate or candidates and a white candidate or candidates for a countywide office in a partisan election. This was the Superior Court Clerk contest in the 2012 general election. Brian Whiteside, an African American, competed for this seat against a white opponent. The other exogenous elections include 10 statewide interracial general elections. This constitutes the complete set of exogenous countywide general elections from 2008 through 2014. The analyses of these elections only includes the votes cast in Gwinnett County.[2]

12.     The estimates of the group support in the county in these elections will be based on all of the precincts in the county, and the precincts with the greatest proportion of Latino and Asian voters therefore will always be included in the analyses. And to keep the focus on what Dr. Alford calls "the particulars of the available data" (at 4), I rely on the same script that Dr. Alford used in his analyses of the elections in this case, which is the script that has produced the largest confidence intervals in his analyses. The analyses will be based on the same number of simulations, 50,000, which Dr. Alford relied upon, derived from the same number of iterations, 510,000. I will also use his preference to treat whites as a separate category. In short, I use Dr. Alford's statistical methodology. The only thing that differs from Dr. Alford's analyses is that I focus on countywide exogenous contests, rather than voting in smaller district elections.

---

[2] All of the minority candidates in these elections were African Americans.

13. The results of the analyses of countywide voting in these exogenous elections are reported in Table R.2. This table is structured in the same manner as the other tables I included in my Declarations in this case. It identifies the elections analyzed, the names of the minority candidates, and the estimated point estimates, along with confidence intervals for them.

14. Table R.1 is easy to summarize due to the consistency in the results across elections. The lowest point estimate for African American voter support for an African American candidate out of the 11 elections is 75.6 percent, in the 2008 election for President. The range of estimates of their support for the other 10 African American candidates is 82.8 percent to 98.0. In eight of the elections their support for the African American candidate is estimated to be above 90.0 percent. All of the confidence intervals for these estimates are reasonable. The Latino voters joined the African American voters in supporting the minority candidates. The estimates of their support for them range from 83.0 to 90.9 percent in these elections. Again, all of the confidence intervals for these estimates are reasonable. The point estimates for the Asian American voters' support for the minority candidates start at 70.2 percent and reach 82.6 percent. The confidence intervals for these estimates for Asian Americans, the smallest of the protected groups, start above 50 percent in five of the eleven instances. The confidence intervals for the Latino and Asian American estimates are generally closer to those I report for the endogenous elections than those that Dr. Alford reports for them.

15. White voters in Gwinnett County have not been supportive of the minority-preferred candidates. Their largest estimated vote for a minority candidate occurred in the 2008 election for President, 27.4 percent. The other estimates for them start at 8.2 percent. All of the point estimates for white support have reasonable confidence intervals.

16. Regardless of their support among African American, Latino, and Asian American voters, all of the minority-preferred candidates in these 11 elections lost the vote in Gwinnett County.

17. The analyses of countywide voting in these exogenous elections reveal racially polarized voting in Gwinnett County. These elections were analyzed, as noted above, using Dr. Alford's script and group formatting.  The only difference from his analyses is the focus on voting across the county, in which the number of precincts is much larger than in district elections, and in which all of the elections include voters in the most Latino and Asian Americans precincts.

## Conclusion

18. I continue to conclude, as I did in my initial Declaration for this case, that Gwinnett County's African American, Latino, and Asian American voters have been internally cohesive and also collectively cohesive in their preference to be represented by the minority candidates in these elections. I also conclude that white voters, or the "other" voters, have cast votes in those elections that have resulted in the defeat of those candidates.  In short, voting in these elections for the Gwinnett County Commission and the Gwinnett County Board of Education is appropriately characterized as racially polarized.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed on February 2, 2018, in Durham, North Carolina.

*[signature]*

Richard L. Engstrom

# EXHIBIT R.1

## Exogenous General Elections Conducted Countywide, 2008-present

## Vote for Non-White (African American) Candidates

|  | % of African Americans | % of Latinos | % of Asian Americans | % of Whites | % of Others |
|---|---|---|---|---|---|

### 2012 Gwinnett County Superior Court Clerk

**Whiteside**

|  | 97.6 | 89.9 | 82.6 | 13.0 | 84.9 |
|---|---|---|---|---|---|
|  | (90.0 – 98.9) | (79.9 – 95.4) | (56.4 – 92.4) | (11.4 --19.8) | (68.9—94.1) |

### 2014 Lt. Governor

**Stokes**

|  | 88.1 | 85.7 | 70.2 | 13.3 | 75.3 |
|---|---|---|---|---|---|
|  | (56.1 – 96.7) | (70.1 – 94.5) | (44.6 – 89.1) | (7.9 --32.4) | (41.3—91.6) |

### 2014 Secretary of State

**Carter**

|  | 91.6 | 85.5 | 71.6 | 13.6 | 70.5 |
|---|---|---|---|---|---|
|  | (62.5 – 96.8) | (70.2 – 94.4) | (36.4 – 87.7) | (9.5 -28.5) | (36.8—92.0) |

### 2014 School Superintendant

**Wilson**

|  | 94.3 | 87.8 | 75.4 | 14.9 | 78.4 |
|---|---|---|---|---|---|
|  | (63.3 – 98.6) | (74.1 – 95.4) | (45.9 – 91.8) | (11.1 --31.5) | (42.5—94.5 |

| | % of African Americans | % of Latinos | % of Asian Americans | % of Whites | % of Others |
|---|---|---|---|---|---|
| **2014 Labor Commissioner** | | | | | |
| **Shipp** | 95.1 (68.5 – 98.5) | 88.3 (74.9 – 95.0) | 76.2 (33.3 – 90.7) | 11.9 (9.0 –27.5) | 80.6 (42.9—94.5) |
| **2014 Insurance Commissioner** | | | | | |
| **Johnson** | 97.7 (96.5 – 98.7) | 88.9 (78.2 – 95.1) | 79.1 (60.6 – 91.4) | 11.2 (9.6 --13.2) | 86.7 (70.7—96.0) |
| **2012 U.S. President** | | | | | |
| **Obama** | 82.8 (56.3 – 95.8) | 90.9 (79.2 – 96.4) | 74.1 (36.3 – 87.2) | 19.0 (11.4 –37.7) | 85.9 (48.1—96.4) |
| **2010 U.S. Senator** | | | | | |
| **Thurmond** | 97.3 (77.2 – 98.8) | 83.0 (63.5 – 93.5) | 74.0 (46.0 – 89.9) | 9.2 (7.8 –19.0) | 86.3 (49.0—96.2) |
| **2010 Secretary of State,** | | | | | |
| **Sinkfield** | 97.8 (96.3 – 98.8) | 84.5 (68.6 – 93.9) | 77.6 (58.4 – 90.5) | 8.2 (6.6 – 9.8) | 90.7 (79.2—96.8) |

|  | % of African Americans | % of Latinos | % of Asian Americans | % of Whites | % of Others |
|---|---|---|---|---|---|
| **2010 Labor Commissioner** | | | | | |
| **Hicks** | 98.0 (96.9 – 98.9) | 85.1 (69.3 – 94.2) | 81.5 (63.9 – 93.5) | 9.1 (7.9 – 10.7) | 91.2 (82.7—96.4) |
| **2008 U.S. President** | | | | | |
| **Obama** | 75.6 (52.4 – 89.9) | 84.2 (65.4 – 94.3) | 76.7 (50.3 – 91.7) | 27.4 (19.0 – 41.7) | 68.4 (32.1—94.1) |